## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICHARD ROLAND LAIRD,**<br>　　　　　**Petitioner,**<br><br>　　　　v.<br><br>**JOHN E. WETZEL, Acting Secretary,**<br>**Pennsylvania Department of Corrections,**<br>**LOUIS FOLINO, Superintendent of the**<br>**State Correctional Institution at Greene,**<br>**MARIROSA LAMAS, Superintendent of**<br>**the State Correctional Institution at**<br>**Rockview, THE DISTRICT ATTORNEY**<br>**OF THE COUNTY OF BUCKS, and THE**<br>**ATTORNEY GENERAL OF THE STATE**<br>**OF PENNSYLVANIA,**<br>　　　　　**Respondents.** | **CIVIL ACTION**<br><br><br><br>**NO.  11-1916** |

## M E M O R A N D U M

**DuBois, J.**　　　　　　　　　　　　　　　　　　　　　　　**August 18, 2016**

### Table of Contents

I.　　INTRODUCTION ................................................................................................................ 2

II.　　BACKGROUND ................................................................................................................. 3

　A.　　History of Laird's Prior Conviction ................................................................ 3

　B.　　Factual Background ............................................................................................ 4

　C.　　Procedural History of the Current Petition ....................................................... 7

III.　　LEGAL STANDARDS ...................................................................................................... 8

　A.　　Exhaustion and Procedural Default .................................................................. 8

　　1.　　The Exhaustion Requirement ..................................................................... 8

　　2.　　Procedural Default ...................................................................................... 9

　B.　　Independent and Adequate State Grounds ...................................................... 11

　C.　　Application of 28 U.S.C. § 2254 ....................................................................... 13

　D.　　Ineffective Assistance of Counsel Claims under *Strickland v. Washington* .............. 15

IV.　　DISCUSSION ................................................................................................................. 16

　A.　　Guilt Phase Claims ........................................................................................... 16

　　1.　　Jury Selection and Change of Venue (Claim VIII) ........................................ 16

　　　(a.)　　Presumption of Prejudice ........................................................... 20

　　　(b.)　　Actual Prejudice .......................................................................... 24

1

(c.)   Conclusion ................................................................................................ 26

2.   Trial Counsel's Investigation and Presentation of Diminished Capacity
Evidence (Claim V) ................................................................................... 27

(a.)   Fact Witnesses ........................................................................................... 27

(b.)   Expert Witnesses ........................................................................................ 35

(c.)   Medical Records......................................................................................... 42

(d.)   The Pennsylvania Supreme Court Did Not Unreasonably Apply *Strickland* .................. 44

3.   Frank Chester's Testimony and Presence in the Courtroom (Claim IX) ............................. 45

(a.)   Identification of Chester Before the Jury .................................................. 46

(b.)   Commonwealth's Use of Chester's Prior Testimony Despite its Belief
that the Testimony was False .................................................................... 49

(c.)   Excuse of Procedural Default: Cause and Prejudice or Miscarriage of Justice ............... 52

4.   Trial Court's Refusal to Instruct the Jury on Lesser Offenses (Claim VII) ......................... 54

5.   Double Jeopardy (Claim VI) ..................................................................................... 59

(a.)   Re-trial for the "Same Offense" ............................................................... 61

(b.)   Multiple Punishments for the "Same Offense" ......................................... 66

B.   Penalty Phase Claims ...................................................................................................... 68

1.   Penalty Counsel's Investigation and Presentation of Mitigation Evidence (Claim I) ........... 68

(a.)   Insufficiency of 2007 Mitigation Presentation in Comparison to 1997
PCRA Presentation (Mark Laird, Dr. Henry Dee, Dr. Robert Fox)............................... 69

(b.)   Failure to Call Additional Expert in Male Sexual Abuse.............................................. 77

2.   Victim Impact Evidence (Claim III) .............................................................................. 82

3.   "Prior Bad Acts" Evidence (Claim IV).......................................................................... 90

4.   Trial Court's Instructions and Prosecutor's Argument Regarding Mitigation (Claim II)...... 97

C.   Cumulative Prejudice Claim (Claim X)............................................................................ 104

V.   CONCLUSION ..................................................................................................................... 105

# I.   <u>INTRODUCTION</u>

This is a habeas corpus case brought by a state prisoner, Richard Laird, under 28 U.S.C.

§ 2254.  After obtaining habeas relief in this Court, which was upheld on appeal by the United

States Court of Appeals for the Third Circuit, Laird was re-tried for first-degree murder in the

Court of Common Pleas of Bucks County, Pennsylvania.  The jury found Laird guilty of first-

degree murder and returned a verdict of death.  The matter is before the Court at this time on

Laird's second Petition under 28 U.S.C. § 2254.

Presently before the Court is Laird's petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254, in which he claims that his second trial and sentencing violated his constitutional

rights.  For the reasons that follow, his petition is denied and dismissed.

## II.   BACKGROUND

### A.   History of Laird's Prior Conviction[1]

On May 19, 1988, petitioner and his co-defendant Frank Chester were convicted of, *inter

alia*, first degree murder and kidnapping in relation to the death of Anthony Milano on December

15, 1987.  The jury returned a verdict of death against both defendants on May 21, 1988.  On

July 19, 1989, the trial court sentenced petitioner to death on the first degree murder charge and

to a "consecutive sentence of not less than 10 nor more than 20 years" on the kidnapping charge.

Petitioner was not sentenced in connection with any of the other crimes for which he was

convicted: second and third degree murder, aggravated assault, unlawful restraint, false

imprisonment, conspiracy, and possession of an instrument of crime.[2]

Petitioner's direct appeals and petitions for collateral review of his conviction and

sentence were denied, first by the Court of Common Pleas of Bucks County and then by the

Pennsylvania Supreme Court.

In 1999, petitioner filed a Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 in

this Court.  By Memorandum and Order dated September 5, 2001, this Court granted that

---

[1] The Court's Memorandum and Order dated September 5, 2001 granting Laird's first petition for habeas relief under 28 U.S.C. § 2254 contains a more extensive explanation of this history.  *See Laird v. Horn*, 159 F. Supp. 2d 58, 68-69 (E.D. Pa. 2001).
[2] *See Laird v. Horn*, 414 F.3d 419, 430 n.9 (3d Cir. 2005) (explaining that, if a conviction was obtained after retrial, Laird could be sentenced "on the remaining charges that he was convicted of" in his first trial).

petition in part on the grounds that (1) there was a reasonable likelihood that the jury applied the

trial court's accomplice liability instructions in a way that relieved the prosecution of

establishing beyond a reasonable doubt that petitioner harbored a specific intent to kill;

(2) petitioner's right to a fair trial and sentencing was violated when he was forced to wear

shackles and handcuffs visible to the jury; (3) there was a reasonable likelihood that the jury

applied the trial court's mitigating circumstance instruction in a way that precluded them from

considering constitutionally relevant evidence; and (4) defense counsel's failure to conduct any

investigation into petitioner's background and many possible sources of mitigating evidence at

sentencing was objectively unreasonable and resulted in prejudice.  *Laird v. Horn*, 159 F. Supp.

2d 58 (2001).  This Court vacated Laird's first degree murder conviction and death sentence

without prejudice to the right of the Commonwealth of Pennsylvania to re-try Laird for first

degree murder and, if he was found guilty, to seek the death penalty again at sentencing.  *Id.*  By

Opinion and Order dated July 19, 2005, the United States Court of Appeals for the Third Circuit

affirmed the judgment of this Court.  *Laird v. Horn*, 414 F.3d 419 (3d Cir. 2005).

## B.  Factual Background

Petitioner was re-tried in January and February of 2007 in the Court of Common Pleas of

Bucks County.  The facts underlying petitioner's current first-degree murder conviction, as

summarized by the Pennsylvania Supreme Court on direct appeal, *Com. v. Laird*, 988 A.2d 618,

625-627 (Pa. 2010), are as follows:

At 11:30 p.m. on December 14, 1987, the victim, Anthony Milano, drove to the Edgely

Inn in Bristol Township, a bar where Laird and Chester were drinking and playing pool.  Milano

had never met Laird or Chester prior to that evening.  During the next three hours, Milano,

Chester, and Laird drank alcohol and conversed together.  The bartender testified that, at some

point, Laird and Chester began taunting Milano concerning his masculinity because they believed he might be homosexual.  In this respect, Laird used derogatory terms such as "fag" when speaking of Milano to others at the bar, and at one point told the bartender that he (Laird) was "sick and tired of these people trying to infiltrate us."  Nevertheless, Milano agreed to give Laird and Chester a ride home.  Multiple witnesses testified that, during this time, and throughout the ensuing events, Laird seemed coherent, was able to stand without swaying, and was not slurring his speech.  Laird, Chester, and Milano ultimately left the Edgely Inn just before 2:30 a.m. on December 15, with Milano driving his car and Chester and Laird supplying directions.

Approximately one hour later, the three individuals, still in Milano's car, proceeded to a wooded area of the township, stopped along the side of the road, and exited the vehicle.  Chester then punched or kicked Milano in the head several times, causing him to fall to the ground.  Laird jumped on top of Milano, pinned him to the ground, and killed him by slashing his throat repeatedly with a box-cutter.  Laird and Chester ran toward the home of a friend, Rich Griscavage.  En route, Laird took off his shirt, wiped blood from his jacket with it and discarded it.  Upon arriving at Griscavage's house, Chester and Laird were visibly agitated.  Chester told Griscavage that they had gotten into a fight with someone and "the dude is dead," whereupon Laird interrupted and instructed Chester not to discuss the matter.  Soon thereafter, Griscavage gave Laird a ride home on the back of his motorcycle.  He testified that Laird did not have any trouble keeping his balance or leaning into turns, so that the ten-minute motorcycle ride was uneventful.

Later that day, Laird's girlfriend observed Laird place his keychain, which was covered with blood, as well as all of the clothing he was wearing when he arrived home, into a plastic

bag, which he then discarded in a dumpster in a nearby town.  She testified that he always carried his box-cutter with him, but that he disposed of it after the murder by throwing it into a creek. Additionally, Laird asked her if she could "be an alibi," repeated his instruction to Chester not talk to anyone about the incident, and stated, "no evidence, no crime."  Finally, the Commonwealth introduced a tape recording and transcript of a consensually intercepted telephone call between Chester and Laird on December 20, 1987.  During the call, Laird suggested that Chester leave town, stated his intention to "hide until this blows over," recommended ways of passing a polygraph test, commented on the district attorney's inability to prove a case without evidence, and expressed his belief that criminal homicide is subject to a seven-year statute of limitations.  Two days later, Laird was arrested at a motel in Falls, Pennsylvania.

Laird presented at trial substantial expert testimony of a diminished capacity defense based on his alleged inability to form a specific intent or to remember the murder.  This evidence included opinion testimony that petitioner's blood-alcohol content on the night of the murder would have been approximately 0.45 percent (more than eight times the legal limit), that he had organic brain damage and was addicted to drugs and alcohol, which impaired his ability to plan and execute a course of action and to behave rationally, and that he had no present memory of the crime.

The jury in Laird's second trial rejected the diminished capacity defense and found him guilty of first-degree murder on February 9, 2007.  After hearing evidence presented during the penalty phase, which lasted two days, the jury returned a verdict of death.

### C.  Procedural History of the Current Petition

Laird's conviction and sentence were upheld by the Pennsylvania Supreme Court on April 9, 2010.  The United States Supreme Court denied Laird's petitioner for writ of *certiorari* on November 29, 2010.

On March 17, 2011, petitioner filed a Motion For Appointment of Federal Habeas Corpus Counsel and Leave to Proceed In Forma Pauperis in this Court. By Order dated March 24, 2011, the Court granted petitioner's Motion and appointed the Federal Community Defender Office for the Eastern District of Pennsylvania to represent Laird and allowed counsel 180 days to file a petition for writ of habeas corpus. On that same date, petitioner filed an Emergency Motion for Stay of Execution, which the Court granted by Order dated April 19, 2011.

On November 3, 2011, petitioner filed a Petition for Writ of Habeas Corpus in this Court. On February 21, 2012, petitioner filed a Motion to Stay Federal Habeas Corpus Proceedings and for Federally Appointed Counsel to Pursue and Complete Exhaustion in State Courts. By Order dated March 8, 2012, the Court granted the Motion to Stay and ordered the Federal Community Defender Office to expeditiously exhaust all state court remedies and move to have the matter returned to the court's active docket within thirty days after exhaustion of all such remedies.

On March 23, 2011, petitioner initiated post-conviction proceedings under the Pennsylvania Post-Conviction Relief Act ("PCRA") in the Court of Common Pleas of Bucks County and moved for a stay of execution, which was granted.  On September 19, 2011, petitioner filed his PCRA petition.  The Court of Common Pleas held an evidentiary hearing on May 23, 24, June 19, and September 14, 2012.  That court denied the petition for PCRA relief by Order dated August 7, 2013 and issued an opinion explaining the grounds for the denial on April 4, 2014.

On September 3, 2013, petitioner timely appealed the denial of his PCRA petition to the Pennsylvania Supreme Court.  The Pennsylvania Supreme Court affirmed the denial of post-conviction relief on all claims by Opinion and Order dated July 20, 2015.

On October 7, 2015, petitioner filed a Motion to Reactivate Case in this Court pursuant to the Order dated March 8, 2012.  The Court granted the Motion in part by Order dated October 16, 2015.  Petitioner filed a Consolidated Petition for Writ of Habeas Corpus and Supporting Memorandum of Law on February 19, 2016.  Respondents filed a Response on April 19, 2016, and Petitioner filed a Reply on June 24, 2016.

## III.   **LEGAL STANDARDS**

### A.  **Exhaustion and Procedural Default**

#### 1.   **The Exhaustion Requirement**

A federal writ of habeas corpus may not be granted to a person incarcerated pursuant to a state court judgment unless he or she has first exhausted the remedies available in state court.  As amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254 provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1).

To satisfy this exhaustion requirement, the petitioner must "afford each level of the state courts a fair opportunity to address the claim," *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir. 1996), *abrogated on other grounds by Beard v. Kindler*, 558 U.S. 53 (2009), by fairly presenting "the federal claim's 'factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted,'"  *Harmon v. Lamar*, No. 13-3762, 2016 WL 521084, at *3 (3d Cir. Feb. 10, 2016) (*quoting McCandless v. Vaughn,* 172 F.3d 255, 261 (3d

Cir. 1999)).  "It is not enough that all the facts necessary to support the federal claim were before

the state courts," *Anderson v. Harless,* 459 U.S. 4, 6 (1982), and "'mere similarity of claims is

insufficient to exhaust,'" *Bronshtein v. Horn*, 404 F.3d 700, 725-26 (3d Cir. 2005) (*quoting*

*Duncan v. Henry,* 513 U.S. 364, 366 (1995) (per curiam)).  Rather, the petitioner must

demonstrate that "the claim brought in federal court [is] the substantial equivalent of that

presented to the state courts.  Both the legal theory and the facts supporting a federal claim must

have been submitted to the state courts."  *Lesko v. Owens*, 881 F.2d 44, 50 (3d Cir. 1989)

(citations omitted), *cert. denied*, 493 U.S. 1036 (1990).

     The Third Circuit has observed that a petitioner can present a federal claim in state court

through, for example, "(a) reliance on pertinent federal cases; (b) reliance on state cases

employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so

particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a

pattern of facts that is well within the mainstream of constitutional litigation."  *Nara v. Fran*k,

488 F.3d 187, 198 (3d Cir. 2007), *as amended* (June 12, 2007) (citing *McCandless*, 172 F.3d at

260).

### 2.   Procedural Default

     Even if a petitioner did not present a claim to the state courts, that claim may nevertheless

be exhausted if "(i) there is an absence of available State corrective process; or (ii) circumstances

exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C.

§ 2254(b)(1)(B).  *See also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006) ("In habeas, state-court

remedies are described as having been 'exhausted' when they are no longer available, regardless

of the reason for their unavailability."); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (explaining

that the second exception applies when "corrective process is so clearly deficient as to render

futile any effort to obtain relief").  "A habeas petitioner who has defaulted his federal claims in

state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."   *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

However, "[w]hen a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court" because it is procedurally defaulted.  *Ylst v. Nunnemaker,* 501 U.S. 797, 801 (1991); *Coleman,* 501 U.S. at 750 ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred. . . .").

The same is true when a claim is unexhausted but some independent state procedural rule bars the petitioner from returning to state court to exhaust the claim.  In this case, the state procedural rule that would prevent petitioner from returning to state courts to litigate any unexhausted claims in his federal petition is the statute of limitations on post-conviction relief under the PCRA, which requires any post-conviction petition to be filed within one year of when a defendant's conviction becomes final.  42 Pa.C.S. § 9545(b)(1); *Keller v. Larkins*, 251 F.3d 408, 415–16 (3d Cir. 2001) (explaining that federal claims unexhausted in Pennsylvania state courts are procedurally defaulted because of the one-year PCRA statute of limitations).

Although procedurally defaulted claims are barred as a general rule, a federal court may reach such claims upon a showing of cause and prejudice or a fundamental miscarriage of justice.  *Id.*  As explained by the Third Circuit, "claims deemed exhausted because of a state procedural bar are procedurally defaulted, and federal courts may not consider their merits unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default."  *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir. 2000), *cert. denied,* 531 U.S. 1082 (2001) (internal quotation marks omitted) (citing *Coleman,* 501 U.S. at 731).

To establish "cause" for procedural default, "the petitioner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'"  *Werts v. Vaughn,* 228 F.3d 178, 193 (3d Cir. 2000) (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1986)), *cert. denied*, 532 U.S. 980 (2001).  A petitioner can show cause by demonstrating, for example, "a factual or legal basis for a claim was not reasonably available to counsel or. . . interference by government officials sufficient to make compliance [with the state procedural rule] impracticable."  *Id.* at 193 (citing *Murray,* 477 U.S. at 488).

To show "prejudice," the petitioner must prove "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady,* 456 U.S. 152, 170 (emphasis in original).  "This standard essentially requires the petitioner to show he was denied 'fundamental fairness' at trial."  *Werts,* 228 F.3d at 193.

Finally, "[t]o show a fundamental miscarriage of justice, a petitioner must demonstrate that he is actually innocent of the crime, by presenting new evidence of innocence."  *Keller*, 251 F.3d at 415-16 (3d Cir. 2001) (internal citation omitted) (citing *Schlup v. Delo,* 513 U.S. 298, 316 (1995), *McCleskey v. Zant,* 499 U.S. 467, 494 (1991)).

### B.  <u>Independent and Adequate State Grounds</u>

Default can also occur independently of exhaustion.  "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

"A state rule provides an independent and adequate basis for precluding federal review of a claim if the rule speaks in unmistakable terms, all state appellate courts refused to review the petitioner's claims on the merits, and the state courts' refusal was consistent with other decisions, that is, the procedural rule was consistently and regularly applied." *Albrecht v. Horn*, 485 F.3d 103, 115 (3d Cir. 2007) (internal alterations and quotation marks omitted) (quoting *Doctor v. Walters,* 96 F.3d 675, 683–84 (3d Cir. 1996)).  *See generally* James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure § 26.1 (7th ed. 2016) (discussing the criteria used to determine whether a state procedural rule constitutes an independent and adequate state ground).  Such a rule is independent "when resolution of the state procedural law question [does not] depend[ ] on a federal constitutional ruling."  *Ake v. Oklahoma,* 470 U.S. 68, 75 (1985).

However, a state procedural rule will not bar federal review of a habeas claim unless that rule was firmly established and regularly followed at the time the default occurred.  *See Ford v. Georgia,* 498 U.S. 411, 424 (1991) (holding that "an adequate and independent state procedural bar to the entertainment of constitutional claims must have been firmly established and regularly followed by the time as of which it is to be applied" in order to preclude federal habeas review (internal quotation marks omitted)); *Doctor,* 96 F.3d at 684 ("A state rule is adequate only if it is 'consistently and regularly applied.'" (quoting *Johnson v. Mississippi,* 486 U.S. 578, 587)).  "As such, in determining whether a particular state rule is independent and adequate, the Court must identify the state procedural rule, ascertain the time at which the alleged default occurred and then decide whether the rule was firmly established and regularly and consistently applied at the time the alleged default occurred."  *Laird v. Horn*, 159 F. Supp. 2d 58, 74 (E.D. Pa. 2001).

### C.  **Application of 28 U.S.C. § 2254**

Once a federal habeas court determines that a petitioner has exhausted state remedies and that a claim is not procedurally defaulted, the court must determine whether the claim was adjudicated on the merits in state court.  "[T]he distinction between claims that have been so adjudicated and claims that have not been means the difference between highly deferential review and de novo review."  *Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 544 (3d Cir.), *cert. denied sub nom. Collins v. Wetzel*, 135 S. Ct. 454 (2014).

"For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that 1) finally resolves the claim, and 2) resolves the claim on the basis of its substance, rather than on a procedural, or other, ground." *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009), *as corrected* (July 15, 2009) (clarifying that the adjudication "can occur at any level of state court").  Moreover, "the Supreme Court [has] held that qualification for AEDPA deference 'does not require citation of our [federal] cases— indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state court decision contradicts them.'"  *Priester v. Vaughn*, 382 F.3d 394, 398 (3d Cir. 2004) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

In the event that a claim was not adjudicated on the merits by the state courts, the District Court exercises "pre-AEDPA independent judgment."  *Hameen v. Delaware*, 212 F.3d 226, 248 (3d Cir. 2000); *see also* 28 U.S.C. § 2254(d) (limiting the grant of the writ "with respect to any claim that was adjudicated on the merits in State court proceedings").  This requires the federal court to "conduct a de novo review over pure legal questions and mixed questions of law and fact. . . However, § 2254(e)(1) still mandates that the state court's factual determinations are

presumed correct unless rebutted by clear and convincing evidence." *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010) (citation omitted) (internal quotation marks omitted).

If the state court resolved the issue on the merits, the federal court reviews that decision with deference.  Section 2254(d) forecloses relief unless the state court's "adjudication of the claim [on the merits]—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

In *Williams v. Taylor,* 529 U.S. 362 (2000), the Supreme Court, interpreting § 2254 as amended by AEDPA, explained that the "contrary to" clause implicates two different types of cases.  Specifically, "a federal habeas court may grant the writ if the state court [1] arrives at a conclusion opposite to that reached by this Court on a question of law or [2] if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413.

Under the "unreasonable application" clause, a federal court may grant habeas relief when the state court identifies the correct legal principle from the decisions of the Supreme Court, but unreasonably applies that principle to the facts of a particular case. *Id.* "A state determination may [also] be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).

14

The Supreme Court distinguished between incorrect application and unreasonable application of federal law in *Williams,* concluding that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. When inquiring into whether the application of law was unreasonable in a particular case, the federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. In determining whether the state court applied Supreme Court precedent reasonably, habeas courts may consider the decisions of the lower federal courts. *Matteo v. Superintendent,* 171 F.3d 877, 890 (3d Cir. 1999) ("[T]he primary significance of the phrase 'as determined by the Supreme Court of the United States' is that federal courts may not grant habeas corpus relief based on the state court's failure to adhere to the precedent of a lower federal court on an issue that the Supreme Court has not addressed."), *cert. denied sub nom. Matteo v. Brennan,* 528 U.S. 824 (1999). "In essence, § 2254(d)(1) 'demands that state-court decisions be given the benefit of the doubt,' and the Supreme Court has cautioned lower courts against any 'readiness to attribute error' by failing to 'presume that state courts know and follow the law.'" *Sawyer v. Superintendent Muncy Sci*, 619 F. App'x 163, 169 (3d Cir. 2015) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)), *cert. denied sub nom. Sawyer v. Smith*, 136 S. Ct. 1173 (2016).

### D.  Ineffective Assistance of Counsel Claims under *Strickland v. Washington*

Ineffective assistance of counsel claims are analyzed in two parts. "First, the defendant must show that counsel's performance was deficient," meaning that it "fell below an objective standard of reasonableness" under all the circumstances, including "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A court considering a claim

of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). "Second, the defendant must show that [counsel's] deficient performance prejudiced the defense," which requires the defendant to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 687, 694.

*Strickland* itself poses a high bar, but "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Against this doctrinal backdrop, the Court now turns to the merits of petitioner's claims.

## IV.   DISCUSSION

### A.   Guilt Phase Claims

#### 1.   Jury Selection and Change of Venue (Claim VIII)

Petitioner contends that his Sixth Amendment right to a fair trial by a panel of impartial jurors was violated when the trial court seated jurors who "were exposed to relentless pretrial publicity" that disclosed that petitioner had previously been convicted and sentenced to death for killing Anthony Milano, and characterized "the case as a hate crime due to the victim being a homosexual." Consolidated Petition for Writ of Habeas Corpus and Supporting Memorandum of Law ("Pet.'s br."), at 128-29. Three months before trial began, petitioner's trial counsel moved to change venue, arguing that was necessary in order to avoid a jury pool unfairly prejudiced by

media coverage of the crime.  The trial court denied this motion on the ground that there was insufficient evidence of overwhelming pretrial publicity at that point in time, but said that it would allow defense counsel to renew the motion closer to the trial date.

Trial counsel never renewed the motion for change of venue despite the fact that several articles were published after the initial denial of the motion, one prospective juror told the trial court "that she had heard other members of the jury panel discussing newspaper articles about the case" during jury selection, and a seated juror (Juror #12) told the trial court that he heard from a co-worker, who had attended high school with petitioner, that the case was "gruesome." Pet.'s br. at 130.  During *voir dire*, however, trial counsel did submit as evidence of potentially prejudicial publicity two news articles published around the time that jury selection began.  Pet.'s br. at 133-34.

Petitioner claims that his trial counsel's failure to renew the motion for change of venue was unreasonable and prejudicial under *Strickland*.  Pet.'s br. at 136-37.  During the post-conviction hearing, petitioner's attorneys testified that they did not renew the motion during jury selection because, under the circumstances, they did not believe that it would be granted and therefore continuing to litigate the motion would have been a "waste of time."  N.T. May 23, 2012 at 106-07, 144.  Petitioner argues that this point of view was unreasonable and that he was prejudiced by the fact that the jury was selected from Bucks County residents who were exposed to negative publicity about his case.  Pet.'s br. at 137.  For the following reasons, the Court rejects petitioner's arguments.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the right to "a trial by an impartial jury free from outside influences."  *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966); *see also Skilling v. United States*, 561 U.S. 358, 378 (2010); *Patton v.*

*Yount*, 467 U.S. 1025 (1984); *Rideau v. Louisiana*, 373 U.S. 723 (1963).  A criminal defendant can demonstrate that his jury was biased, and therefore that his trial was fundamentally unfair, in two ways: (1) by proving that "media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process," in which case prejudice to the defendant is presumed; or (2) by demonstrating "actual prejudice— that is, a juror unable to render a fair and impartial verdict based solely on the evidence. . . ." *Rock v. Zimmerman*, 959 F.2d 1237, 1252-53 (3d Cir. 1992), *overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619 (1993); *see also Skilling*, 561 U.S. at 385 (considering actual prejudice after concluding that the facts did not warrant a presumption of prejudice); *Patton*, 467 U.S. at 1035-36.  Petitioner argues that the facts of this case are sufficient to prove both presumed prejudice and actual prejudice, and therefore his counsel was ineffective for failing to renew the motion for a change of venue.  Pet.'s br. at 134.

With respect to the first method of demonstrating that a jury was biased, "[a] presumption of prejudice . . . attends only the extreme case." *Skilling*, 561 U.S. at 381.  To succeed in securing such a presumption, a criminal defendant must demonstrate that "[t]he community and media reaction. . . [was] so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury." *Rock*, 959 F.2d at 1252 (explaining that the presumption applies in cases with "an 'utterly corrupt' trial atmosphere). The Supreme Court has identified four factors to be considered in determining whether pretrial publicity warrants a presumption of prejudice in a particular case: (1) the size and characteristics of the community from which the jury pool was drawn, (2) the nature of the publicity, (3) the time between the media attention and the trial, and (4) whether the jury's ultimate decision indicates bias. *Skilling*, 561 U.S. at 379, 382-84.

Under the second method of establishing jury bias, a criminal defendant must show that at least one juror was actually biased and unable to render an impartial verdict based solely on the evidence. *Rock*, 959 F.2d at 1253. Due process does "not require[ ]. . . that the jurors be totally ignorant of the facts and issues involved;" rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961). Ultimately, jury selection "is particularly within the province of the trial judge," and thus "[r]eviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling*, 561 U.S. at 386.

The Pennsylvania Supreme Court rejected petitioner's claim based on jury selection and the need for a change of venue on the ground that petitioner failed to demonstrate that he was prejudiced by the pretrial publicity—either presumably or actually—and thus could not show that his counsel was ineffective for failing to renew the change of venue motion. *Com. v. Laird*, 119 A.3d 972, 981-82. The Pennsylvania Supreme Court explained that the two articles in the record (which were submitted by trial counsel during *voir dire*) were not "materially sensational, inflammatory, or slanted toward conviction" and thus petitioner had failed to show that prejudice should be presumed. *Id.* at 981. That court further held that petitioner did not prove actual prejudice because there was no evidence demonstrating that any seated juror was unable "to 'set aside [his] impressions or preliminary opinions and render a verdict solely based on the evidence presented to [him] at trial.'" *Id.* (quoting *Com. v. Briggs*, 12 A.3d 291, 314 (Pa. 2011)). Specifically, the court rejected petitioner's argument that he was actually prejudiced by Juror

19

#12, the only juror on which petitioner's argument of actual prejudice is based, because that juror "testified during *voir dire* that he did not form any preconceived ideas about Appellant's guilt or innocence. . . ." *Id.* at 982.

The Pennsylvania Supreme Court addressed this argument on the merits, and thus § 2254(d) governs this Court's review of petitioner's jury selection claim.

(a.) Presumption of Prejudice

Petitioner first argues that relief is warranted on his jury selection/change of venue claim under § 2254(d)(2) because the decision of the Pennsylvania Supreme Court that prejudice should not be presumed in this case was based on an unreasonable determination of the facts in light of the record. Pet.'s br. at 138.  Petitioner specifically contends that the Pennsylvania Supreme Court unreasonably "limited its review of the pretrial publicity to the two articles submitted during jury selection, ignoring the publicity that led up to trial."  Pet.'s br. at 138; *see also Laird*, 119 A.3d at 981 ("Only two articles of record were disseminated in the media shortly before Appellant's retrial….").  Those two articles were published the day before jury selection began ("Convicted killer back in court," January 28, 2007)[3] and on the second day of jury selection ("Jury selection begins in Laird retrial," January 30, 2007).  The Pennsylvania Supreme Court found that these articles were not "materially sensational, inflammatory, or slanted toward conviction," and that the only aspect of the articles that would warrant a presumption of prejudice under Pennsylvania state law was their revelation that petitioner "had been convicted and sentenced to death previously, and that the then-impending proceeding would be a retrial necessitated by the federal courts' decision to vacate his first-degree murder conviction and death sentence."  *Laird*, 119 A.3d at 981 (citing *Com. v. Karenbauer*, 715 A.2d 1086, 1092 (Pa. 1998)).  The Pennsylvania Supreme Court noted that the January 30, 2007 article "contains a

---

[3] This article is not included in petitioner's Appendix.

sensationalized sentence. . . quot[ing] an unnamed prosecutor as stating that whoever perpetrated the crime 'slic[ed] Milano up like a cheap piece of tenderloin,'" but found that "the remainder of the story [wa]s factual in nature." *Id.*

This Court concludes that the decision of the Pennsylvania Supreme Court was not unreasonable in light of the record. First, as for petitioner's contention that the state court improperly limited its presumption-of-prejudice-analysis of pretrial publicity to only two articles, petitioner has failed to demonstrate (1) that he produced additional articles or evidence of publicity for the state court to examine and (2) that there was any additional publicity that his counsel should have submitted to the trial court in support of a renewed motion for change of venue. Concerning the second point, petitioner has produced for this Court seven additional articles concerning his re-trial. *See* Appendix to Consolidated Pet. for Writ of Habeas Corpus and Supporting Mem. of Law, ECF No. 39-1 (hereinafter "Appendix"). Of these seven additional articles, three were published after the jury selection was completed,[4] so it was impossible for trial counsel to have relied on them during jury selection. One of the articles was published in 1988,[5] after petitioner's first trial, and could have little or no effect on jury selection in 2007. The Court determines that the other three articles, published from June 30 to October 31, 2006, do not undermine the decision of the Pennsylvania Supreme Court because they predominantly contain factual, not inflammatory, reporting. *See* Appendix at 167-71. The Court concludes that petitioner has produced no evidence in support of his argument that pretrial publicity was so overwhelming and inflammatory that prejudice in this case should be presumed

[4] *See* Appendix, at 1-6 (three articles published on February 8, 10, and 15, 2007, after the trial began on February 5 and ended on February 13).
[5] *See* Appendix, at 132-166 (one article published in two parts in December 1988 and January 1989, largely based on a reconstruction of the evidence from the first trial). Petitioner does not claim, nor could he, that an article published in 1988-1989 prejudiced the Bucks County jury pool in 2007. *See Patton*, 467 U.S. at 1035 (holding that the passage of time between a first trial and second trial can cure prejudice that existed at the time of the initial trial).

and that his trial counsel could have successfully litigated a renewed motion for a change of

venue on that ground.

Petitioner relies on *United States v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015), in

support of his argument that the pretrial publicity in this case warrants a presumption of

prejudice.  In that case, the defendant was convicted of murdering his wife eight days before he

was indicted by a federal grand jury for falsely telling federal officers that he had been the victim

of a carjacking three days after his wife was killed.  *Id.* at 383.  During his murder trial, the state

argued that he staged the carjacking so that the murder weapon would appear "stolen "and not be

found.  *Id.*  His murder trial was sensationalized in the press: "television, radio, internet, and

print media outlets in Puerto Rico ha[d] continuously, intensely and uninterruptedly covered

[his] case virtually on a daily basis" once his wife's body was discovered, "the media covered

every minute of every day" of his murder trial, and his sentencing on the criminal charges was

broadcast live on television, internet, and radio.  *Id.* at 383-84 (internal quotation marks omitted).

The government did not oppose the motion for a change of venue, and conceded that defendant

had proved that prejudice should be presumed.  Nevertheless, the federal trial court denied the

defendant's motion for change of venue outside Puerto Rico on the ground that "there [wa]s a

sufficient possibility we can get a[n impartial] jury."  *Id.* at 384.

The United States Court of Appeals for the First Circuit held that the trial court abused its

discretion in denying the motion on the ground that prejudice should have been presumed from

the "blatantly prejudicial" media coverage.  *Id.* at 386-87.  The First Circuit relied on the district

court's finding that "'Puerto Rico is a compact, insular community' that is highly susceptible to

the impact of local media," the government's agreement that "the media coverage was massive

and sensational," the fact that the "media reported rumors about Casellas's character" and

22

extensively covered the murder trial, in which the state "claimed Casellas lied about the carjacking—the crime in this case," and that the jury's conviction of Casellas on all federal counts (two of which were nullified by the trial court). *Id.* at 386-88.

The publicity in this case is miniscule in comparison to the overwhelming media coverage at issue in *Casellas-Toro*. Over the course of this litigation, petitioner and his counsel have referred to a total of nine articles and one radio broadcast. *See* Pet.'s br. at 130-34; Appendix, at 1-6, 132-173. Not only does the record presented by petitioner and his counsel reveal that there was little media coverage, it demonstrates that the overall quality of the coverage was not inflammatory or sensational. In its best light, petitioner's argument that ten instances of media coverage—very little of which was inflammatory—over the course of three months, in a fairly large community of approximately 625,000 people, is insufficient to warrant a presumption that the jury pool was so overwhelmed with prejudicial information that no impartial jury could be assembled. *See Skilling*, 561 U.S. at 379, 382-84 (articulating four factors); *cf. Rock*, 959 F.2d at 1253 (upholding trial court's determination that publication of thirteen articles and eleven radio stories during three month period was insufficient to support a presumption of prejudice).

Petitioner also incorrectly contends that *Casellas-Toro* stands for the proposition that media coverage revealing "the opinion of another jury" in a previous trial of the same case may prejudice an entire jury pool. *See* Pet.'s br., at 138 (citing 807 F.3d at 387). First, as explained above, *Casellas-Toro* did not concern a second trial for the same offense (like this case), but a later trial for a factually related offense. Second, and more importantly, the statement of the *Casellas-Toro* court that a pool of potential jurors "may have difficulty disbelieving or forgetting the opinion of another *jury*," as revealed to them by the press, was subsumed in its discussion of

the second *Skilling* factor: the nature of the publicity.  It is precisely the nature of the publicity in this case that is distinguishable from the nature of the publicity in *Casellas-Toro*.  The fact that an earlier jury verdict was disclosed did not, in and of itself, warrant a presumption of prejudice in *Casellas-Toro*; rather, it was the pervasive and inflammatory nature of the media coverage overall, in combination with the other three *Skilling* factors, that warranted such a presumption in that case, and that does not support such a presumption in this case.[6]  *See Casellas-Toro*, 807 F.3d at 388 ("The *Skilling* factors reveal this to be an extreme case.").

For these reasons, the Court concludes that the Pennsylvania Supreme Court's rejection of petitioner's presumption of prejudice argument was reasonable.

(b.) Actual Prejudice

Petitioner next contends that the decision of the Pennsylvania Supreme Court rejecting the jury selection/change of venue claim on actual prejudice grounds was based on an unreasonable determination of the facts in light of the record.  *See* 28 U.S.C. § 2254(d)(2).  The Court rejects this argument and concludes that the decision of the Pennsylvania Supreme Court was reasonable.

Petitioner argues that his counsel should have moved for a change of venue on the ground that the pretrial publicity about his case had actually prejudiced the jury pool.  In support of this argument, petitioner relies on the fact that, on the second day of jury selection, a "prospective juror. . . told the court that she had heard members of the jury panel discussing newspaper articles about the case."  Pet.'s br. at 132-33 (citing N.T. Jan. 30, 2007, at 201).  Petitioner also

---

[6] Petitioner does not argue that the decision of the Pennsylvania Supreme Court was contrary to federal law under *Skilling*, and thus the Court does not address such an argument.

notes that a total of 22 prospective jurors out of a total pool of 150 venire persons, or 14.66 percent, testified that they generally knew about the case.[7]  Pet.'s br. at 132; Resp't br., at 121.

The Court rejects this argument.  The fact that potential jurors had prior knowledge about the defendant or the crime does not automatically demonstrate that a potential juror is actually prejudiced.  *Irvin*, 366 U.S. at 722-23.  The more important question is the number of venire persons who had already formed an opinion about petitioner's guilt that they could not set aside.  From the record, it appears that only one out of the 150 potential jurors stated that such knowledge would make it difficult for him to be fair and impartial.  N.T. Jan. 29, 2007, at 382.  Contrary to petitioner's argument, the record does not disclose that the entire jury pool was unduly prejudiced against him.  *Cf. Patton*, 467 U.S. at 1029-30 (rejecting actual prejudice challenge when 77% of prospective jurors admitted that they would carry an opinion about petitioner's guilt into the jury box); *Murphy v. Florida*, 421 U.S. 794 (1975) (same when 20 of 78 venire persons were excused for cause "because they indicated an opinion as to petitioner's guilt").

Petitioner's actual prejudice argument also focuses on Juror #12, who admitted during *voir dire* that one of his co-workers had known petitioner in high school.  *See* Pet.'s br. at 139.  The co-worker reportedly described the crime as "gruesome" and in a "less than flattering" way based on an article he had read.  *Id.*  In rejecting this argument, the Pennsylvania Supreme Court

---

[7] Respondents argue that petitioner's *Strickland* claim on this issue was not fairly presented to the Pennsylvania Supreme Court and therefore is not exhausted.  Resp't br., at 126.  The Court disagrees.  Petitioner challenged the appropriateness of jury selection in his case on the grounds that his counsel was ineffective and that it violated his right to due process under the United States Constitution.  Petitioner also fairly informed the Pennsylvania Supreme Court about the fact that prospective jurors may have discussed newspaper articles about his case, *Com. v. Laird*, No. 683 Capital Appeal Docket, Initial Brief of Appellant, at 74-75 (Aug. 22, 2014) (hereinafter "Pet.'s PASC br.").  Thus, petitioner presented "the federal claim's 'factual and legal substance to the state court[ ],'" and his claim was exhausted.  *Harmon v. Lamar*, No. 13-3762, 2016 WL 521084, at *3 (3d Cir. Feb. 10, 2016) (quoting *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)); *see Lesko v. Owens*, 881 F.2d 44, 50 (3d Cir. 1989) ("Both the legal theory and the facts supporting a federal claim must have been submitted to the state courts.").

did not consider petitioner's allegation that the co-worker, after describing the crime, encouraged Juror #12 to try to be selected for the jury. *See Laird*, 119 A.3d at 982; Pet.'s br. at 139-40. The omission of this fact from its analysis, however, does not undermine that court's determination. In fact, the Pennsylvania Supreme Court properly relied on the fact that "Juror 12 testified during *voir dire* that he did not form any preconceived ideas about Appellant's guilt or innocence, and that he would refrain from speaking any further to his co-worker about the case." *Laird*, 119 A.3d at 982.

Actual prejudice cannot be proven when "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23; *see also Patton*, 467 U.S. at 1029-30, 1039 (Court of Appeals determined that defendant was actually prejudiced when 8 of 14 seated jurors had an opinion as to defendant's guilt at one point in time, but Supreme Court reversed on the ground that actual prejudice could not be demonstrated when all of those jurors testified that they could set those opinions aside). In this case, Juror #12 stated that he could be impartial. On that record, petitioner has not demonstrated actual prejudice by the seating of Juror #12. N.T. Jan. 30, 2007, at 68, 71.

For these reasons, this Court concludes that the Pennsylvania Supreme Court reasonably rejected petitioner's actual prejudice arguments.

(c.) Conclusion

The Pennsylvania Supreme Court reasonably rejected petitioner's ineffective assistance of counsel claim based on jury selection and the failure to renew the motion for a change of venue. First, because a presumption of prejudice was not warranted and there was no actual prejudice, petitioner has not demonstrated that his counsel acted unreasonably in failing to renew the motion for a change of venue. *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim."). Second,

petitioner has not demonstrated prejudice under *Strickland* because he failed to present any evidence or argument that would have warranted the granting of a renewed motion to change venue, and therefore there is no reasonable likelihood that the outcome of the proceeding would have been different.  The Court thus rejects petitioner's claim for relief under § 2254(d) on the ground that his counsel failed to provide effective assistance in connection with jury selection.

    **2.   Trial Counsel's Investigation and Presentation of Diminished Capacity Evidence (Claim V)**

    Petitioner claims that he was prejudiced by his counsel's deficient presentation of evidence in support of his diminished capacity defense during the guilt phase of the trial.  Specifically, petitioner argues that his counsel was ineffective in presenting the diminished capacity defense on the grounds that he mishandled fact witness testimony, expert testimony, and documentary evidence (such as petitioner's medical records).  Pet.'s br. at 88.  It is petitioner's position that the Pennsylvania Supreme Court's rejection of these three arguments was unreasonable in light of the record.  *Id.* at 112.  Petitioner also claims that the Pennsylvania Supreme Court's separate analysis of each of the three issues—fact  witnesses, expert witnesses, and medical records—was an unreasonable application of *Strickland* because it failed to account for the prejudicial effect of counsel's performance in the guilt phase as a whole.  Pet.'s br. at 111.  The Court will address these issues in turn.

    (a.)  <u>Fact Witnesses</u>

    Petitioner first claims that his trial counsel was ineffective because he failed to fully examine the Commonwealth's fact witnesses based on their testimony at the 1988 trial in presenting evidence of petitioner's impairment from alcohol consumption on the night of the offense.  According to petitioner, at the 2007 trial many Commonwealth witnesses

> "claimed they could not recall with any specificity the type or amount of alcohol Petitioner had consumed that evening [of the murder].  However,

27

> during the proceedings in 1988. . . and in their statements to investigators at
> the time of the crime, all of these witnesses described Petitioner as
> significantly impaired from drinking alcohol.  Given that witnesses in this
> case would be testifying about events that transpired in 1987, reasonable
> trial counsel would, at a minimum, have anticipated that witnesses might
> have some difficulty recalling the events of that evening and would have
> been prepared to refresh their recollection with their prior testimony and/or
> statements."

Pet.'s br. at 89.  Moreover, petitioner contends that counsel failed to effectively impeach the

same witnesses when they "change[d] their testimony, testif[ied] falsely, or minimize[d] the

extent of Petitioner's impairment that evening."  Pet.'s br. at 90.

Specifically, petitioner relies on the following differences between testimony elicited at

the 2007 trial and the witnesses' prior testimony and statements to show that his counsel was

ineffective:

- At petitioner's 2007 trial, Alan Hilton testified that he could not remember
whether petitioner and Chester were drinking at Chester's apartment.  At the 1988 trial,
Hilton testified that petitioner and Chester drank at both the apartment and the bar, and
that petitioner drank beer and shots at the Edgely Inn.  Pet's brief at 91-92.  Hilton also
told an investigator (Joe Stark) in 1988 that petitioner and Chester were "shit-faced."
Pet's brief at 92.

- In 2007, Gale Gardner testified that she remembered "people drinking," but could
not remember what type of alcohol or how much alcohol petitioner consumed.  Pet's
brief at 93.  In 1988, Gardner testified that petitioner and Chester were drinking beer and
that she thought petitioner was drunk at the Edgely Inn because he was slurring his
speech and talking loudly.  Pet's brief at 93-94.  Gardner was also at the apartment when
Chester and petitioner returned around 4:00 a.m.  In 2007, after she testified that
petitioner was "coherent" at 4:00 a.m., trial counsel impeached her with her 1988 trial
testimony that petitioner was "drunk" when he returned to the apartment.  However,
petitioner faults counsel for failing to impeach Gardner with her more specific prior
inconsistent statement to the police in 1987 that petitioner was "mumbl[ing]" and
"stagger[ing]" when he returned to the apartment at 4:00 a.m.  Pet's brief at 94.
Petitioner also faults counsel for failing to impeach Gardner with the fact that, in 1987,
she had initially lied to the police and said that Chester was not at petitioner's apartment
on the night of the murder and the fact that she was on probation in Florida for a traffic
offense, which gave her a "motive to testify favorably for the Commonwealth."  Pet.'s br.
at 95.

- Jolanda Thompson was at the Edgely Inn on the night of the crime.  In 2007,
Thompson testified that everyone was drinking but that she "wasn't paying that much

attention to what they were drinking." Pet.'s br. at 96.  Petitioner faults counsel for failing to impeach Thompson with her 1987 statement to investigators that petitioner "was drinking shots. . . They both were downing shots" and that the owner of the bar had asked her "not to say that Frank was drunk because he was underage." Pet.'s br. at 96. Petitioner argues that, by "questioning Ms. Thompson about that statement, counsel could have also developed his theory that the bartender that evening, James Phillips, Jr., was minimizing the level of petitioner and Chester's impairment in order to protect the bar owner [his father] from civil liability." Pet.'s br. at 97.

- James Phillips, Jr., was the bartender at the Edgely Inn on the night of the crime and his parents owned the bar.  In 2007, Phillips testified that he served petitioner one shot and served his table two pitchers of beer.  In 1988, Phillips testified that he served petitioner two or three shots of vodka and served petitioner and Chester at least four pitchers of beer.  Pet.'s br. at 97.  Petitioner also argues that his counsel "failed to effectively cross-examine James Phillips about his motive to minimize the amount of alcohol he served petitioner because of liability for his family business" based on Thompson's statement.  Pet.'s br. at 97-98.

After reviewing the evidence that petitioner claims should have been admitted, the Pennsylvania Supreme Court ruled that petitioner had not demonstrated prejudice under *Strickland*.  Specifically, that court concluded: "If counsel had done everything Appellant now alleges he should have done, it is possible the jury would have been left with the impression that he had consumed even more alcohol, but the additional amount would not likely have been significant; as such, it would not have materially aided Appellant's defense in view of the record as a whole." *Com. v. Laird*, 119 A.3d 972, 985 (Pa. 2015).

Petitioner claims that the Pennsylvania Supreme Court's rejection of this argument was unreasonable in light of the state court record.  According to petitioner, that court held "that counsel was not ineffective" and petitioner was not prejudiced "for failing to use the Commonwealth witnesses to bring out evidence of Petitioner's *impairment* on the night of the offense, because counsel presented evidence of alcohol *consumption*." Pet.'s br. at 112 . Petitioner contends that the Pennsylvania Supreme Court's focus on evidence of "the number of drinks" he consumed was unreasonable in light of the record when the issue at trial was his "impairment at the time of the murder," thus entitling him to relief under § 2254(d)(2).  Pet.'s br.

at 113-14 ("Because evidence of impaired functioning is different from and more critical to a diminished capacity defense than evidence of [the] amount of alcohol consumed, it was unreasonable for the state court to fail to analyze the effect of counsel's failure to present evidence of impaired functioning.").

Respondents argue that the ruling of the Pennsylvania Supreme Court was not unreasonable.  First, they state that "[p]etitioner's attempt to parse out his claim by distinguishing alcohol consumption versus impairment fails on this record.  It is clear counsel attempted to establish both consumption and impairment."  Resp't br. at 93.  Respondents also contend that counsel reasonably presented the diminished capacity defense by cross-examining all of the Commonwealth's fact witnesses and presenting the testimony of four expert witnesses, who opined that petitioner's blood-alcohol content was 0.45 at the time of the murder and that the combination of that amount of alcohol with his underlying brain damage resulted in his inability to form specific intent.  Resp't br. at 93.  Respondents finally argue that petitioner cannot demonstrate that he was prejudiced because "the questions Petitioner contends counsel failed to ask would not have meaningfully contributed to the overall evidence counsel presented regarding consumption and impairment."  Resp't br. at 94.

The Pennsylvania Supreme Court addressed this argument on the merits, and thus § 2254(d) governs the Court's review of this claim.  This Court determines that the conclusion of the Pennsylvania Supreme Court with respect to prejudice was reasonable and thus rejects petitioner's argument.  Petitioner contends that the Pennsylvania Supreme Court was unreasonable in focusing on the fact that the 2007 jury heard considerable evidence regarding how much he drank on the night of the murder, but insufficient evidence of impairment due to alcohol consumption.  Inconsistent with that argument, most of the evidence that petitioner now

30

claims should have been admitted concerns the amount of alcohol that he ingested and not the degree to which he was impaired.  *See* Pet.'s br. at 91-97 (citing Hilton's 1988 testimony that petitioner and Chester drank at both the apartment and the bar, and that petitioner was drinking beer and shots at the Edgely Inn, Gardner's 1988 testimony that petitioner and Chester were drinking beer, Thompson's 1987 statement to investigators that petitioner "was drinking shots. . . They both were downing shots," and Phillips's 1988 testimony that he served petitioner two or three shots of vodka and served petitioner and Chester at least four pitchers of beer).

While petitioner is correct that evidence of impairment is more important than evidence of alcohol consumption in proving a diminished capacity/voluntary intoxication defense (or obtaining an instruction on such a defense)[8], the record belies his argument that trial counsel failed to adequately present such a defense.  First, petitioner's trial counsel introduced sufficient evidence of impairment to warrant jury instructions by the trial court on diminished capacity and voluntary intoxication.  *See* N.T. Feb. 9, 2007, at 79-80.  Second, if petitioner is correct that the amount of alcohol ingested is relatively unimportant in proving diminished capacity, the additional evidence about his alcohol consumption on the night of the murder that petitioner contends his trial counsel should have adduced at trial is equally unimportant.  Finally, even if the additional testimony about his *consumption* of alcohol was introduced at trial, there is no reasonable probability that the outcome would have been different because the jury was properly

---

[8] *See, e.g.*, *Jordan v. Beard*, No. 02 Civ. 8389, 2003 WL 22845418, at *5 (E.D. Pa. Nov. 26, 2003) ("An overview of Pennsylvania case law in this area shows that petitioner does not satisfy his burden for a voluntary intoxication instruction by merely proving he was drinking prior to committing the offense with which he has been charged. As previously stated, the record must show that the petitioner was so overwhelmed or overpowered by the alcohol he consumed that he suffered a complete loss of his faculties or sensibilities."); *Com. v. Sanchez*, 82 A.3d 943, 977 (2013) ("Where a defendant admits to committing a killing, in order to be entitled to a voluntary intoxication instruction… [m]ere evidence of the consumption of alcohol or drugs and an appearance of intoxication is not sufficient to support a conclusion that a defendant was overwhelmed or overpowered to the point of being incapable of forming the requisite specific intent to kill.").

instructed that petitioner's level of *impairment* was most important in considering his diminished capacity defense.  *See* N.T. Feb. 9, 2007, at 79 (instructing the jury that "the defendant is permitted to claim as a defense that he was so overpowered by intoxicants that the defendant had lost control of his faculties and was incapable of forming specific intent to kill required for first degree murder.").

Petitioner relies on only three pieces of evidence concerning the degree of his impairment that were not admitted at the 2007 trial to demonstrate that he was prejudiced by his trial counsel's alleged errors: (1) Hilton's statement from 1988 that petitioner and Chester were "shit-faced"; (2) Gardner's 1988 testimony that she thought petitioner was drunk at the Edgely Inn because he was slurring his speech and talking loudly; and (3) Gardner's statement to the police in 1987 that petitioner was "mumbling" and "stagger[ing]" when he returned to the apartment at 4:00 a.m.  Pet's brief at 92-94.  The Court determines that the Pennsylvania Supreme Court's rejection of petitioner's arguments regarding this evidence was reasonable.

Hilton's statement about petitioner being "shit-faced" was made to an investigator, Joe Stark, in 1988.  At the post-conviction hearing, trial counsel explained that during his preparation for the 2007 trial, he could not locate Stark to secure him as a witness,[9] which led him to believe that he would be unable to confront Hilton with an authenticated version of his prior inconsistent statement during trial.  N.T. May 23, 2012, at 45 (explaining that if Hilton "had denied [making his statement to Stark]. . . I don't know what I would have done" because Stark was unavailable). While trial counsel stated that there was no "strategy or tactic" for his failure to present Hilton's statement, N.T. May 23, 2012, at 47, the Court concludes that counsel did not act unreasonably in choosing not to confront Hilton with a statement that he could not authenticate.

---

[9] Trial counsel's belief was substantiated by Stark's testimony at the PCRA hearing that, during the time leading up to the 2007 trial, he was having personal difficulties that may have prevented him from returning phone calls and responding to inquiries.  *See* N.T. May 23, 2012, at 212-13.

Trial counsel also testified at the post-conviction hearing that he would have been worried about introducing Gardner's statement that petitioner was "stagger[ing]" and "mumbl[ing]" after the crime because in the same testimony Gardner had said that petitioner was "soaked in blood." N.T. May 23, 2012, at 54-55. Even though counsel stipulated that petitioner participated in the murder, he believed it could harm the defense if the jury believed that petitioner was "soaked in blood" and thus petitioner, and not Chester, was the more violent and culpable person. N.T. May 23, 2012, at 55-56. Although counsel did not recall having this exact thought at the time of trial, N.T. May 23, 2012, at 56, the conclusion of the Pennsylvania Supreme Court that petitioner failed to demonstrate that his counsel was ineffective in failing to elicit potentially damaging testimony was not unreasonable. *Laird*, 119 A.3d at 984-86.

Moreover, Hilton and Gardner's statements that petitioner was slurring his speech and talking loudly while he was at the bar are indicative of his level of impairment, but insignificant in comparison to the other evidence of petitioner's impairment on the night of the crime that was presented at the 2007 trial. For example, trial counsel presented the following evidence indicating that petitioner was impaired:

- Officer Patrick Connell's 1988 testimony that he saw petitioner at the Edgely Inn after midnight on December 15, 1987, petitioner was "adamant and boisterous" and used expletives when he refused to provide proof of identification, and the fact that petitioner argued with police officers and the odor of alcohol on petitioner's breath convinced him that petitioner was intoxicated. N.T. Feb. 5, 2008, at 128-30, 135;

- Thompson testified that petitioner "gave [her] the creeps" and "was very loud, boisterous," that at one point petitioner was "hollering," and that petitioner and Chester were "partying." N.T. Feb. 5, 2008, at 169, 171, 175;

- Phillips testified that petitioner was being "mean-spirited" and a "bully," that petitioner told Officer Connell and other officers that "it was none of their F-ing business" how long he had been at the bar, that petitioner and Frank Chester started to slow dance together, that petitioner threw or smashed a shot glass. N.T. Feb. 5, 2007, at 195, 204, 212-13, 243, 255;

- Hilton testified that petitioner and Chester were calling people names and being "pretty nasty," and that petitioner made a sexual overture to Gale Gardner.  N.T. Feb. 6, 2007, at 28-29;

- Barbara Parr testified that petitioner and Chester were kick boxing with each other when she arrived at the Edgely Inn, and that when petitioner returned to their apartment around 4:00 a.m. he was drunk and "passed out."  N.T. Feb. 6, 2007, at 106-07, 115-16;

- Richard Griscavage testified that he could smell alcohol on petitioner and Chester when they appeared at his apartment around 4:00 a.m. after the murder.  N.T. Feb. 6, 2007, at 162.

- Gale Gardner testified that petitioner made a sexual remark to her.  N.T. Feb. 7, 2007, at 28;

- Dr. John O'Brien testified that he estimated petitioner to have had a blood-alcohol content of 0.45% on the night of the crime; N.T. Feb. 8, 2008, at 28;

- Chester's declaration stated that "[w]hen [Laird] left the Edgely Inn, Rick was drunk out of his mind.  By the end of that evening, Rick could barely walk.  He was stumbling and falling down in the street.  I damn near carried Rick to Rich Griscavage's house."  N.T. Feb. 8, 2008, at 14;

*See also* N.T. Feb. 9, 2007, at 14-15, 20, 28-31 (counsel's closing argument recounting diminished capacity evidence to the jury).

In comparison to of all of this evidence of the level of petitioner's impairment as a result of alcohol consumption on the night of the offense, the additional testimony from Hilton and Gardner cited by petitioner is cumulative.  Such evidence would have been trivial additions to the other evidence of his impairment.  Accordingly, petitioner has not demonstrated that he was prejudiced by the fact that his counsel did not utilize Hilton's and Gardner's statements at trial.

Finally, the Pennsylvania Supreme Court reasonably concluded that counsel did not render ineffective assistance when he chose not to impeach witnesses who testified favorably for the defense on the topic of diminished capacity.  *Laird*, 119 A.3d at 985.  The record demonstrates that Gardner, Thompson, and Phillips all testified that petitioner was intoxicated and had consumed a substantial amount of alcohol on the night in question.  N.T. Feb. 5, 2007, at

34

169, 171, 175 (Thompson's testimony that petitioner "was very loud, boisterous," that at one point petitioner was "hollering," and that petitioner and Chester were "partying"); N.T. Feb. 5, 2007, at 195, 204, 212-13, 243, 255 (Phillips's testimony that petitioner was being "mean-spirited" and a "bully," that petitioner used expletives and was rude to police officers at the bar, and that petitioner threw or smashed a shot glass);  N.T. Feb. 7, 2007, at 28 (Gardner's testimony that petitioner said he "wanted to run his tongue across [her] teeth").   This Court concludes that the record supports the ruling of the Pennsylvania Supreme Court that petitioner was not prejudiced by the fact that his counsel did not attempt to impeach witnesses, who gave testimony in 2007 that substantiated his diminished capacity defense, with their prior statements and testimony from the 1988 trial.

For these reasons, the Court concludes that the ruling of the Pennsylvania Supreme Court rejecting petitioner's claim under *Strickland* based on his counsel's examination of fact witnesses was reasonable in light of the record, and denies Laird's Petition for relief under § 2254 on this ground.

### (b.) Expert Witnesses

Petitioner claims that his counsel was ineffective in preparing Dr. Henry Dee, Ph.D. and Dr. Robert Fox, Jr., M.D., for trial.  Petitioner was evaluated by Dr. Dee—a psychologist and neuropsychologist—and Dr. Fox—a psychiatrist—in 1997 in connection with petitioner's first PCRA hearing, which was primarily aimed at developing mitigation evidence that was not presented at petitioner's first trial in 1988.  Petitioner first argues that his counsel should be responsible for "the fact that Drs. Dee and Fox had not thoroughly explored the issue of diminished capacity" because "counsel failed to make arrangements for these doctors to reevaluate Petitioner [in 2007] and focus on the issue of his mental state at the time of the crime."  Pet.'s br. at 100.

Petitioner next argues that his counsel's failure to adequately prepare Dr. Dee and Dr. Fox in 2007 resulted in damaging cross-examination from the prosecution because of petitioner's 1988 testimony. Specifically, in 1988 petitioner testified at trial that he recalled the events of the night of the crime and that Frank Chester had killed Anthony Milano. In 2007, the experts testified that petitioner's brain damage negatively affected his memory and that petitioner did not remember the night of the crime. The prosecutor then confronted the experts on cross-examination with petitioner's inconsistent testimony from 1988 that he remembered the crime. Pet.'s br. at 100. Petitioner contends that counsel's failure to anticipate this line of cross-examination and to explore the issue with his experts in advance of trial "constitutes gross incompetence," which prejudiced petitioner because the experts' "credibility [was] irreparably damaged before the jury." Pet.'s br. at 102.

The Pennsylvania Supreme Court addressed this argument on the merits, and thus § 2254(d) governs the Court's review of this claim. The Pennsylvania Supreme Court first concluded that "Appellant has not explained how additional evaluations undertaken closer to the time of the 2007 retrial would have allowed Dr. Dee to testify more persuasively concerning Appellant's diminished capacity in 1987," or prepared "Dr. Fox to testify more forcefully or convincingly that Appellant suffered from diminished capacity." *Com. v. Laird*, 119 A.3d at 988-89. That court also was not "persuaded that the experts' opinions were weakened by a supposed failure to read the 1988 transcript." *Id.* at 989. Finally, the court rejected petitioner's claim on the ground that he did not suffer undue prejudice from the prosecutor's cross-examination, particularly with regard to Dr. Fox who testified "that a person whose memory of the events in question was impaired by operating in an alcohol-induced blackout could later give an account, apparently from memory, of the events that transpired during the relevant interval. . .

through a process known as 'confabulation.'" *Id.* (citing N.T. Feb. 8, 2007, at 141-42).
Petitioner claims that this decision was unreasonable in light of the record.  Pet.'s br. at 111, 114.

The Court first evaluates petitioner's contention that Dr. Fox and Dr. Dee did not
"thoroughly explore[ ] the issue of diminished capacity" in their testimony at the 2007 trial.
Pet.'s br. at 100.  In 2007, Dr. Dee testified that his evaluation of petitioner in 1997 consisted of
multiple performance tests, an interview with petitioner, and interviews with his mother and
brother.  N.T. Feb. 8, 2007, at 77-79.  Based on this evaluation, Dr. Dee discovered that
petitioner's cognitive function was impaired as a result of brain damage, including a significant
impairment in memory functioning, which was likely caused by head injuries.  N.T. Feb. 8,
2007, at 81-83.  Dr. Dee concluded to a reasonable degree of scientific certainty that petitioner
suffered from diminished capacity solely from his brain damage because his "ability to plan and
carry out any kind of sequential behavior was impaired by" his head injury in 1981, "including
the events of the night of the murder." N.T. Feb. 8, 2007, at 85-86.  Dr. Dee testified that, in
petitioner's case, the combination of brain damage plus excessive alcohol ingestion impaired his
ability to form the specific intent to kill.  N.T. Feb. 8, 2007, at 87-90.

Similarly, Dr. Fox testified that he interviewed petitioner, investigated his personal
history, and relied on the psychological tests performed by Dr. Dee in 1997.  N.T. Feb. 8, 2007,
at 123-24, 126-27.  Dr. Fox diagnosed petitioner with post-traumatic stress disorder, attention-
deficit/hyperactivity disorder ("ADHD"), brain damage from repetitive head injuries, and drug
and alcohol abuse.  N.T. Feb. 8, 2007, 127-28.  He explained that the type of brain damage from
which petitioner suffers impairs executive functioning, i.e. decision-making, organization, and
rational thinking.  N.T. Feb. 8, 2007, at 132-134.  Dr. Fox also testified that petitioner was
"severely impaired" on the night of the crime when his blood-alcohol content was estimated to

be 0.45%, and that individuals with such a high blood alcohol content can be in an "alcohol delirium," which causes them to suffer from blackouts and memory loss.  N.T. Feb. 8, 2007, at 139-40.  Consistent with Dr. Dee's testimony, Dr. Fox testified that excessive alcohol consumption "increases the impairment" of an individual who already suffers from underlying brain damage.  N.T. Feb. 8, 2007, at 143.  Finally, Dr. Fox opined that on the night of the offense petitioner suffered from a diminished capacity to form specific intent because of the degree of his cognitive impairment due to brain damage, which was heightened by the effect of the large quantity of alcohol he consumed.  N.T. Feb. 8, 2007, at 144-45.

The Court determines that the decision of the Pennsylvania Supreme Court rejecting this aspect of petitioner's claim was reasonable in light of the record.  First, petitioner's argument that it was necessary for Dr. Dee and Dr. Fox to evaluate him again in advance of the 2007 trial is meritless.  Petitioner fails to identify any additional evidence that might have been discovered from another evaluation nineteen years after the crime occurred.  For this reason, and because of the experts' detailed testimony in support of petitioner's diminished capacity defense at the 2007 trial, the Pennsylvania Supreme Court properly rejected this argument.

The Court next addresses petitioner's argument that his trial counsel did not adequately prepare Dr. Dee and Dr. Fox for cross-examination on the subject of petitioner's 1988 testimony.  Dr. Dee and Dr. Fox examined petitioner in 1996, and both experts met petitioner on only one other occasion: in 2007, Dr. Fox met petitioner on the evening before his testimony, and Dr. Dee met with petitioner on the morning of his testimony.  On cross-examination at the 2007 trial, the prosecutor asked Dr. Dee why he had not discussed the murder during his conversation with petitioner earlier that morning.  N.T. Feb. 8, 2007, at 101.  Dr. Dee responded that, first, it was not relevant to his goal of determining whether petitioner suffered from cognitive impairment,

and second, that petitioner said he did not remember the night of the crime.  N.T. Feb. 8, 2007, at

101-02.  The latter point was consistent with the experts' opinions that petitioner's brain damage

negatively affected his memory.  The prosecutor then asked Dr. Dee whether he was aware that

petitioner testified in detail about the crime during the 1988 trial; Dr. Dee responded that he was

aware that petitioner had testified, but he could not remember the details of that testimony.  N.T.

Feb. 8, 2007, at 106-07.  Dr. Dee then agreed with the prosecutor that petitioner's apparent

memory of the events in 1988 was more indicative of his memory capabilities on the night of the

crime in 1987 than his lack of memory in 2007, thus implying that petitioner may not have been

suffering from the effects of brain damage on the night of the crime.  N.T. Feb. 8, 2007, at 111.

Dr. Fox testified on cross-examination at the 2007 trial that, the previous evening,

petitioner told him that he had no memory of what happened on the night of the crime after he

was shooting pool at the Edgely Inn.  N.T. Feb. 8, 2007, at 150-51.  Dr. Fox next stated that he

had read the 1988 transcript of petitioner's testimony, and that he remembered petitioner

testifying in detail about the night of the crime and the killing of Anthony Milano. N.T. Feb. 8,

2007, at 154-56.  He then had the following exchange with the prosecutor:

> "Q: You would agree with me that somebody who would testify to these
> specific details would have a pretty good memory of what happened,
> correct?
> A: Not necessarily.
> Q: Unless they were lying, right?
> A: Or confabulating.
> Q: Well, confabulating, not telling the truth?
> A: It's different from lying."

N.T. Feb. 8, 2007, at 157.  Only a few minutes earlier, Dr. Fox had testified on direct

examination that confabulation occurs when individuals "make up [facts] to fill in the blanks. . .

for the period of time that they don't remember."  N.T. Feb. 8, 2007, at 141-42; *see also id.* at

167-68 (explaining that petitioner's apparent memory of the crime in 1988 was "probably confabulating").

The Court determines that the decision of the Pennsylvania Supreme Court rejecting petitioner's ineffective assistance of counsel claim on the ground that the experts were properly prepared for cross-examination was reasonable.  That court reasonably concluded that Dr. Fox had a logical explanation for the inconsistency between petitioner's 1988 testimony and the experts' conclusions when he testified that petitioner "probably confabulate[ed]" the details of his 1988 testimony after the fact, which petitioner would have been unable to distinguish from actual memory.  *Com. v. Laird*, 119 A.3d at 989; N.T. Feb. 8, 2007, at 167-68.  Contrary to petitioner's argument that additional evaluations by Dr. Dee and Dr. Fox were necessary to rebut the prosecutor's line of questioning, *see* Pet.'s br. at 111, Dr. Fox's explanation sufficiently responded to the cross-examination of both experts on the point of petitioner's memory. Moreover, petitioner has not provided the Court with any evidence or argument as to what more favorable cross-examination testimony would have resulted from counsel's additional preparation of Dr. Dee and Dr. Fox.[10]  The Court declines to impose on trial counsel the impossible burden of immunizing expert witnesses from any damage on cross-examination.

---

[10] The only arguably relevant case on which petitioner relies in support of this argument is *Affinito v. Hendricks*, 366 F.3d 252, 260 (3d Cir. 2004), in which the Third Circuit held that counsel's failure to provide his mental health expert with the defendant's statements to the police constituted deficient performance.  In that case, counsel's failure to acquaint his own expert with the basic underlying facts of the case resulted in the expert reversing his diminished capacity opinion while testifying on cross-examination, and testifying that the defendant would have formulated specific intent to kill.  *Id.*  The Third Circuit held that defense counsel was objectively unreasonable in failing to ensure that his own expert had "as complete and accurate a description of the facts and circumstances surrounding the crime as possible."  *Id.*

Finally, the Court rejects petitioner's argument that the Pennsylvania Supreme Court "unreasonably ignored the fact that the prosecutor successfully undermined the defense expert[s'] opinions *because* they did not evaluate Petitioner after his admission of" participation in the murder.  Pet.'s br. at 115.  As explained above, petitioner has not shown what favorable evidence could have been developed from an additional evaluation.  Furthermore, petitioner has failed to connect the benefits of the hypothetical additional evaluation to any damage caused to the experts' credibility by cross-examination.  Specifically, petitioner has not explained how such an evaluation could have cured the inherent inconsistency between petitioner's 1988 defense that he was not involved in the killing of Anthony Milano and his 2007 defense in which he admitted that he was involved, but lacked the capacity to form a specific intent to kill.  Rather, the Court agrees with respondents' point that the contradiction between petitioner's 1988 testimony and the experts' opinions "was not created. . . by counsel's failure to prepare the experts, but rather by the inconsistency between Petitioner's defenses [of actual innocence at the first trial and diminished capacity]. . . and second trial[ ]."  Resp't br. at 104.  This contradiction prevents petitioner from being able to demonstrate that the result of the proceeding would have been different if his experts had been prepared in a different way or if they had conducted an additional evaluation of petitioner.  The Court concludes that petitioner has failed to prove that he was prejudiced by his counsel's actions.

---

*Affinito* is distinguishable.  There is no contention in this case that Dr. Dee or Dr. Fox was unacquainted with the underlying facts, and neither of those experts reversed their diminished capacity opinions in their testimony.  Instead of agreeing with the prosecutor that the defendant had specific intent, as the expert in *Affinito* did, Dr. Dee only agreed with the prosecutor's statement that petitioner's testimony in 1988 was a better reflection of his memory capabilities in 1987 than his current inability to remember the events surrounding the crime.  N.T. Feb. 8, 2007, at 111.  In *Affinito*, the expert's damaging testimony could clearly have been prevented if counsel had properly informed him of the facts at issue.  In this case, however, there is no evidence or argument as to how additional preparation by counsel could have prevented Dr. Dee from agreeing with a fairly obvious conclusion.

41

The Court concludes that the decision of the Pennsylvania Supreme Court to reject petitioner's ineffective assistance claim in connection with his trial counsel's preparation of expert witnesses and presentation of their testimony during the guilt phase was reasonable. Accordingly, the Court denies Laird's Petition under § 2254 based on this argument.

(c.) Medical Records

Petitioner claims that his trial counsel was ineffective because he failed to introduce medical records substantiating that petitioner had suffered multiple head injuries and had a history of drug and alcohol addiction. Pet.'s br. at 103-105. Specifically, petitioner argues that these records should have been used to corroborate Dr. Dee's testimony that petitioner's brain damage was caused by multiple head injuries and that petitioner was addicted to drugs and alcohol. Petitioner also contends that the records should have been used on re-direct examination to rehabilitate Dr. Dee after he had the following exchange with the prosecutor on cross-examination:

> "Q: You would agree with me that the only injury that you have medical substantiation is the head injuries from 1981, correct?
> A: That's the only one I have records on, yes.
> Q: So all the injuries you're talking about, you got that information from the defendant's mother and the defendant's brother, is that correct?
> A: And from him.
> Q: And from him?
> A: Right.
> Q: So it's only accurate as what they tell you correct?"

Pet.'s br. at 104 (quoting N.T. Feb. 8, 2007, at 97-98). Petitioner contends that the medical records were necessary to rebut the prosecutor's "insinuat[ion]. . . that Petitioner and his family contrived childhood head injuries after his arrest and conviction in this case to bolster an argument of diminished capacity." Pet.'s br. at 104-05.

The Pennsylvania Supreme Court rejected this argument in part on the ground that petitioner suffered no prejudice from his counsel's failure to present the medical records at trial.

That court noted that "the Commonwealth did not dispute that Appellant suffered at least one serious head injury that included a skull fracture in the early 1980s when he fell from a moving vehicle," and emphasized that "[t]he contested issue in the guilt phase was whether the resulting brain damage, combined with other factors such as alcohol consumption, impaired Appellant's cognitive functioning so that his capacity to form a specific intent to kill was diminished." *Laird*, 119 A.3d at 990-91 (footnote omitted).

The Pennsylvania Supreme Court addressed this argument on the merits, and thus § 2254(d) governs the Court's review of this claim. This Court concludes that the ruling of the Pennsylvania Supreme Court that petitioner suffered no prejudice from his counsel's failure to present the medical records at trial was reasonable. In particular, the Court agrees that the question whether petitioner's brain damage was caused by one or several head injuries is ancillary to whether he had the capacity to form specific intent on the night of the crime. *See id.* at 991. Based on the record, petitioner cannot demonstrate that the jury was substantially more likely to accept a diminished capacity defense supported by documentation of multiple head injuries instead of only one injury. Accordingly, the conclusion of the Pennsylvania Supreme Court that petitioner failed to show prejudice under *Strickland* was reasonable.

The Pennsylvania Supreme Court did not address petitioner's claim that his counsel should have introduced the medical records to substantiate the experts' diagnoses that petitioner was addicted to drugs and alcohol, even though it was exhausted and ripe for review. *See Com. v. Laird*, No. 683 Capital Appeal Docket, Initial Brief of Appellant, at 57-58 (Aug. 22, 2014) (hereinafter "Pet.'s PASC br."). The Court thus reviews this claim *de novo*. *See Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 544 (3d Cir.), *cert. denied sub nom. Collins v. Wetzel*, 135 S. Ct. 454 (2014). This Court determines that petitioner has failed to demonstrate

that his counsel's failure to introduce records of his drug and alcohol abuse resulted in prejudice under the second prong of *Strickland*.  The primary issue at trial was whether petitioner was substantially impaired on the night of the offense.  While documentary evidence that petitioner habitually abused alcohol could support his diminished capacity defense that relied, in part, on his intoxication from alcohol consumption, the Court concludes that it is not reasonably probable that "the result of the proceeding would have been different" if this evidence had been introduced.  *Strickland*, 466 U.S. at 687.

Accordingly, the Court denies Laird's Petition under § 2254 on the ground that he suffered prejudice from his trial counsel's failure to introduce the medical records.

### (d.)  The Pennsylvania Supreme Court Did Not Unreasonably Apply *Strickland*

The Court rejects petitioner's claim that the Pennsylvania Supreme Court unreasonably applied *Strickland* when it separately evaluated the three distinct types of evidence that petitioner claimed his counsel was ineffective in presenting.  "A state court decision involves an 'unreasonable application of federal law' under 28 U.S.C. § 2254(d)(1) where it 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'"  *Jacobs v. Horn*, 395 F.3d 92, 120 (3d Cir. 2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 407–08 (2000)).  "For a federal court to find a state court's application of law unreasonable, 'the state court's decision must have been more than incorrect or erroneous.'  Rather, "[t]he state court's application must have been 'objectively unreasonable.'"  *Id.* (quoting *Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003)).

*Strickland* does not impose any rigid or mechanical framework on the court in addressing an ineffective assistance claim.  *See Strickland*, 466 U.S. 668, 697 (explaining that the two prongs may be addressed in any order and a court may dispose of an ineffective assistance claim after analyzing only one component).  Rather, *Strickland* is a "flexible," *McDonald v. Hardy*,

44

359 F. App'x 650, 653-54 (7th Cir. 2010), and "general" standard, *Harrington v. Richter*, 562 U.S. 86, 105 (2011).  This is one of the reasons that so-called "double deference" characterizes the application of § 2254(d) to *Strickland* claims.  *Id.* ("The *Strickland* standard is a general one, so the range of reasonable applications is substantial.")

In this case, it was not "objectively unreasonable" for the Pennsylvania Supreme Court to divide its analysis of petitioner's claim that his counsel was ineffective during the guilt phase into three parts.  Each part focused on the logically separate types of evidence that petitioner claimed were mishandled by his trial counsel.[11]  Thus, the Court concludes that the Pennsylvania Supreme Court's application of *Strickland* to petitioner's claims was not "objectively unreasonable," *Wiggins*, 539 U.S. at 520-521, and rejects petitioner's argument that he is entitled to relief under § 2254(d)(1) on this ground.

### 3.   Frank Chester's Testimony and Presence in the Courtroom (Claim IX)

Petitioner claims that his right to due process under the Fourteenth Amendment was violated when a witness identified Frank Chester in open court as petitioner's co-conspirator and when the prosecution introduced in evidence Chester's testimony from the 1988 trial.  Specifically, petitioner claims that he was prejudiced in two ways: (1) after Chester invoked the Fifth Amendment privilege against self-incrimination outside the presence of the jury and the

---

[11] Moreover, the decision of the Pennsylvania Supreme Court makes clear that petitioner presented these issues separately before the PCRA court, but combined them on appeal.  *Laird*, 119 A. 3d at 982, n. 9 ("Appellant has organized his brief to consolidate the present claim [failure to impeach Commonwealth witnesses] with the next three [failure to move to exclude evidence or request a mistrial, failure to prepare expert witnesses, and failure to introduce medical records].").  Nevertheless, the Pennsylvania Supreme Court addressed the issues separately for valid reasons: "the issues are conceptually distinct, they were raised separately in Appellant's notice of appeal, and the PCRA court treated them seriatim."  *Id.* Moreover, that court explicitly addressed petitioner's fear that the cumulative prejudice of all of the guilt phase errors regarding the diminished capacity defense would be ignored: "To the extent Appellant's present decision to raise them as multiple parts of a single claim is undertaken in an effort to aggregate prejudice, our present disposition does not undermine that objective in light of Appellant's final contention pertaining to cumulative prejudice."  *Id.* (internal citations omitted).  Petitioner's claim that the Pennsylvania Supreme Court failed to consider the cumulative prejudice of these errors is unsupported by the record.

trial court declared him unavailable as a witness, Chester was brought into the courtroom and identified by Detective Robert Potts as petitioner's accomplice in the murder of Anthony Milano; and (2) the prosecution introduced Chester's testimony from 1988 even though it believed the testimony was false, as evidenced by the Commonwealth's prosecution of Chester for the same crime.  Pet.'s br. at 141-43.

For the following reasons, the Court concludes that both aspects of this claim are procedurally defaulted and that petitioner has failed to excuse the default by showing cause and prejudice or a miscarriage of justice.

(a.) <u>Identification of Chester Before the Jury</u>

The factual background of this claim, according to petitioner, is as follows:

> [During the guilt phase of the trial, the] Commonwealth brought Chester from death row to court in prison garb. With the jury removed from the courtroom, Chester asserted his Fifth Amendment privilege, and Judge Boylan found him "unavailable." NT 2/7/07, 13-16. The prosecutor asked that Chester "remain with the sheriffs in the courtroom," and Judge Boylan had him "seated in the first row of seats in the courtroom," where he remained while the jury was brought in. *Id.* at 16. The Commonwealth presented Detective Robert Potts who, at the prosecutor's request, identified Chester for the jury and testified that "no one else has ever been arrested for this murder other than Frank Chester and Richard Laird." *Id.* at 18-19. The sheriffs thereafter removed Chester from the courtroom, as the jury looked on. *Id*. at 22.

Pet.'s br. at 143-44.  Later that day, the prosecutor read into the record Chester's testimony from the 1988 trial, in which Chester claimed that petitioner alone killed Milano.  *Id.* at 144.

Petitioner argues that this sequence of events violated his right to due process under the Fourteenth Amendment because "[i]t is well established under federal. . . law that a jury may not consider that a witness has chosen to exercise his Fifth Amendment privilege because this invites the jury to make an impermissible inference" about the witness's guilt and, for this reason, a prosecutor commits constitutional error by "calling that witness to the stand before the jury" to

46

assert the Fifth Amendment privilege.  Pet.'s br. at 148-49 (citing *United States v. King*, 461 F.2d 53, 56-57 (8th Cir. 1972), *Bowles v. United States*, 439 F.2d 536, 542 (D.C. Cir. 1970)).

Petitioner acknowledges that the trial court properly required Chester to assert his Fifth Amendment privilege outside the presence of the jury.  However, petitioner argues that:

> After Chester claimed the privilege. . . the prosecutor did (and Judge Boylan allowed) what the law forbids – the prosecutor had Chester remain on display in the courtroom while the jury returned; the prosecutor had a prosecution witness identify Chester for the jury; the prosecutor had the witness tell the jury that Chester and Petitioner were the only participants in the offense; and the prosecutor then had Chester removed from the courtroom as the jury watched.  By displaying Chester to the jury and then introducing his prior testimony, the prosecutor achieved the same effect as if she had put Chester on the stand to assert the Fifth Amendment privilege.

Pet.'s br. at 149-50.

Respondents contend that this part of petitioner's claim—allowing Chester to remain in the courtroom and having a prosecution witness identify him as petitioner's accomplice in the offense—was disposed of by the Pennsylvania Supreme Court on an adequate and independent ground of state law, and therefore is outside the scope of this Court's habeas review. Specifically, respondents argue that, because the Pennsylvania Supreme Court rejected petitioner's argument on direct appeal on the ground that petitioner's trial counsel failed to object to the identification of Chester before the jury, this argument cannot be reviewed by this Court. Specifically, respondents rely on the following footnote in the decision of the Pennsylvania Supreme Court:

> As part of this claim, Appellant also includes a separate contention that the trial court should not have allowed Chester to be seated in the courtroom for identification by the arresting officer. . . . Whatever merit this contention may or may not have, Appellant failed to preserve it for review by lodging a timely objection.  *See* N.T. Feb. 7, 2007, at 16-22.

988 A.2d 618, 633 n.13 (Pa. 2010).

This Court agrees with respondents that petitioner's claim cannot be reviewed because the Pennsylvania Supreme Court disposed of the claim on an independent and adequate ground of state procedure. "A state rule provides an independent and adequate basis for precluding federal review of a claim if [1] the rule speaks in unmistakable terms, [2] all state appellate courts refused to review the petitioner's claims on the merits, and [3] the state courts' refusal was consistent with other decisions, that is, the procedural rule was consistently and regularly applied." *Albrecht v. Horn*, 485 F.3d 103, 115 (3d Cir. 2007) (internal quotation marks omitted).

Pennsylvania's requirement that trial counsel contemporaneously object to errors during the trial in order to preserve them for direct appeal is codified in Pennsylvania Rule of Appellate Procedure 302(a), which provides that "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." This was the basis for the Pennsylvania Supreme Court's refusal to review this argument on the merits. *See Albrecht*, 485 F.3d at 115. As other courts in this district have held, this rule speaks in unmistakable terms and was consistently and regularly applied at the time of petitioner's trial in 2007. *See, e.g.*, *McKant v. Cameron*, No. 14 Civ. 2528, 2015 WL 1540790, at *5 n.4 (E.D. Pa. Apr. 6, 2015) (holding that state court's ruling that petitioner waived claim by failing to object during 2008 trial constituted an adequate and independent state ground and precluded federal habeas review); *Granese v. Wenerowicz*, No. 12 Civ. 5875, 2015 WL 996320, at *9 (E.D. Pa. Mar. 4, 2015) (holding, in context of 2006 trial, that "the rule of waiver for failing to raise a contemporaneous objection to the prosecutor's closing argument is both independent and adequate, [and] petitioner has procedurally defaulted this claim. This claim is unreviewable." (internal citation omitted)).

Because all three elements of the independent and adequate state rule inquiry are satisfied, *see Albrecht*, 485 F.3d at 115, petitioner has procedurally defaulted his due process

claim regarding Chester's identification in front of the jury. Whether petitioner can excuse the default will be evaluated in § IV.A.3(c), *infra*.

(b.) Commonwealth's Use of Chester's Prior Testimony Despite its Belief that the Testimony was False

Petitioner also claims that his right to due process under the Fourteenth Amendment was violated when the prosecution introduced Chester's 1988 trial testimony, which the prosecution "believed was false and inconsistent with the physical evidence." Pet.'s br. at 151 (citing *Napue v. Illinois*, 360 U.S. 264, 271 (1959), *Com. v. Bazemore*, 614 A.2d 684, 688 (Pa. 1992)). Respondents state in response that, in his briefs to the Pennsylvania state courts, petitioner asserted this claim under the Confrontation Clause of the Sixth Amendment only, and not the Due Process Clause of the Fourteenth Amendment. Further, petitioner did not raise any Sixth Amendment claim in his § 2254 petition in this Court. Thus, according to respondents, there is no exhausted version of the "false testimony" claim under the Fourteenth Amendment for this Court to review. Resp't br., at 133-34.

Petitioner responds that this claim was properly exhausted in the state courts because he relied on the decision of the Pennsylvania Supreme Court in *Bazemore*, which used the phrase "miscarriage of justice" in this context, and thus alerted the state courts that he was raising a due process claim. Pet.'s Reply br., at 36-37 (quoting *Bazemore*, 614 A.2d at 688); *see Nara v. Frank*, 488 F.3d 187, 198 (3d Cir. 2007) (explaining that a state prisoner can exhaust federal claims by, *inter alia*, "rel[ying] on state cases employing constitutional analysis in like fact situations"). Petitioner also argues that he alleged "a pattern of facts that is well within the mainstream of constitutional litigation" when he argued that his 2007 conviction rested on testimony given in 1988 that the prosecution believed to be false. Pet.'s Reply br. at 37 (quoting *Evans v. Court of Common Pleas, Del. County, Pa*., 959 F.2d 1227, 1232 (3d Cir. 1992)).

49

This Court determines that this claim was not properly exhausted before the state courts for three reasons.   First, petitioner's reliance on *Bazemore* was insufficient to alert the state courts that he was raising a due process claim.  The decision of the Pennsylvania Supreme Court in *Bazemore* focused on a defendant's Sixth Amendment right to confront and cross-examine witnesses who testified against him.  *See Bazemore*, 614 A.2d at 686 (examining "what suffices to establish 'full opportunity' to cross-examine. . . an unavailable witness. . . [in the context of] the Sixth Amendment right of confrontation").  *Bazemore* used the phrase "miscarriage of justice" in the Sixth Amendment context of depriving the defendant of "the opportunity to test the credibility of th[e] witness" that the prosecution knew to be presenting false testimony.  *Id.* at 686-88 (citing 29 Am. Jur. 2d. Evidence, § 738 ("The real basis for the admission of testimony given by a witness at a former trial is to prevent the *miscarriage of justice* where the circumstances of the case have made it unreasonable and unfair to exclude the testimony.") (emphasis added)).  *Bazemore*, a decision interpreting the Sixth Amendment, contains no reference to the Fourteenth Amendment.  Moreover, the Pennsylvania Supreme Court stated that it did not understand petitioner's reliance on this language to raise a federal due process claim. *See Laird*, 988 A.2d at 630-33.  Accordingly, petitioner's reliance on *Bazemore* did not alert the Pennsylvania courts that he was raising a due process claim.

Second, petitioner's use of the phrase "miscarriage of justice" is insufficient, standing alone, to exhaust his due process claim under the Fourteenth Amendment.  In *Duncan*, 513 U.S. 364, 365-66 (1995) (per curiam), the Supreme Court of the United States held that a state prisoner's argument to a state court that an evidentiary ruling amounted to a "miscarriage of justice" did not fairly present a due process claim.  "If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the

Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Id.* at 366; *see also id.* at 366-67 (Souter, J., concurring) ("[R]espondent's 'miscarriage of justice' claim in state court was reasonably understood to raise a state-law issue of prejudice, not a federal issue of due process."). Thus, petitioner's passing reference to a potential and unspecified "miscarriage of justice" in his brief to the Pennsylvania Supreme Court does not support his argument that he exhausted his federal due process claim.

Finally, the Court rejects petitioner's argument that he raised "a pattern of facts that is well within the mainstream of constitutional litigation" in the state courts. Pet.'s Reply br. at 37 (quoting *Evans*, 959 F.2d at 1232). Specifically, petitioner argued before the Pennsylvania Supreme Court that the Commonwealth's prosecution of Chester for the same crime demonstrates that the Commonwealth "disbelieved its own witness'[s]" testimony that petitioner was solely responsible for killing Milano. *Com. v. Laird*, No. 527 Capital Appeal Docket, Initial Brief of Appellant (June 23, 2008), at 32 (hereinafter "Pet.'s PASC Dir. App. br."). This is not the same familiar "pattern of facts" at issue in *Napue v. Illinois*, 360 U.S. 264, 271 (1959), and other cases on which petitioner now relies.

In *Napue*, the prosecutors failed to disclose to defense counsel that a witness had been offered a potential reduction of his sentence in return for testifying against the defendant, and the witness perjured himself when he testified that he had received no promise of consideration in return for his testimony. 360 U.S. at 265-66. The United States Supreme Court held that the defendant's conviction violated due process because it was based on false evidence that went uncorrected by the state. *Id.* at 268; *see also* Pet.'s br., at 151-52 (citing *Kyles v. Whitley*, 514 U.S. 419, 433 n.7 (1995) ("[A] conviction obtained by the *knowing use of perjured testimony* is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false

testimony could have affected the judgment of the jury." (emphasis added)); *Giglio v. United States*, 450 U.S. 150 (1972) (finding a due process violation when one prosecutor's affidavit provided evidence that a witness testified falsely under the direction of another prosecutor at trial)).

In contrast to these cases, petitioner has not produced any evidence that Chester's 1988 testimony was, in fact, false, or that the prosecutor in 1988 knew it to be false and presented it anyway. Thus, petitioner's claim—that the prosecutor "disbelieved" Chester's testimony—does not present the familiar "pattern of facts" that give rise to due process violations, and therefore it is not exhausted.

For these reasons, the Court concludes that petitioner's due process claim based on the Commonwealth's alleged "belief" that Chester's 1988 testimony was false was not exhausted before the state courts. Because petitioner is barred by the one-year statute of limitations from returning to state court to exhaust this claim, this claim is also procedurally defaulted. *See Keller v. Larkins*, 251 F.3d 408, 415–16 (3d Cir. 2001) (citing 42 Pa.C.S. § 9545(b)(1)) (explaining that federal claims unexhausted in Pennsylvania state courts are procedurally defaulted because of the one-year PCRA statute of limitations).

The Court now addresses the question whether petitioner can excuse the default of his claim that his due process rights were violated by Chester's identification before the jury and the Commonwealth's alleged disbelief of his testimony.

(c.) Excuse of Procedural Default: Cause and Prejudice or Miscarriage of Justice

Because petitioner's due process claim concerning Chester's appearance in court and the prosecution's use of his prior testimony at the 2007 trial is procedurally defaulted, "federal habeas review of th[is] claim[ ] is barred unless the prisoner can demonstrate cause for the

default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).  Petitioner presents no argument on these grounds for excusing the procedural default of his due process claim.

The Court determines that there was no cause or prejudice to excuse counsel's failure to properly exhaust this due process claim before the state courts.  The experienced counsel who represented petitioner on direct appeal should have (1) discovered that no objection was raised when Chester was identified and, therefore, should have challenged that identification by an ineffective assistance of counsel claim, and (2) cited to a federal case or explicitly mentioned the Due Process Clause in arguing that Chester's prior testimony was false, or presented evidence demonstrating that the prosecutor knew that Chester perjured himself in 1988.  Moreover, petitioner does not contend that "a factual or legal basis for [his due process] claim was not reasonably available to counsel or [there was] interference by government officials sufficient to make compliance [with the state's contemporaneous objection rule] impracticable."  *Werts v. Vaughn,* 228 F.3d 178, 193 (3d Cir. 2000).

Finally, petitioner has presented no evidence that he is actually innocent, thus precluding a finding that failure to review his due process claim would result in a "miscarriage of justice." *See Keller*, 251 F.3d at 415-16.

For the foregoing reasons, the Court concludes that petitioner's claim is procedurally defaulted and dismisses Laird's § 2254 Petition with respect to his claim under the Due Process Clause of the Fourteenth Amendment.

### 4.   Trial Court's Refusal to Instruct the Jury on Lesser Offenses (Claim VII)

In 1988, petitioner appealed the convictions and sentences imposed at his initial trial. Except for the first degree murder charge, all of his convictions—including those for second and third degree murder—were affirmed on appeal and post-conviction review in state court.

This Court vacated petitioner's initial conviction for first degree murder and his death sentence, and that ruling was affirmed by the United States Court of Appeals for the Third Circuit, resulting in a remand to the Court of Common Pleas of Bucks County for retrial on the first degree murder charge alone. *See Laird v. Horn*, 414 F.3d 419, 430 n.9 (3d Cir. 2005) (affirming this Court's decision vacating Laird's first degree murder conviction, remanding the case to this Court "so that the matter may be returned to state court for further proceedings," and clarifying that "[o]ur holding in no way undermines the jury's guilty verdict on the remaining charges. . . the Commonwealth will have the option of retrying Laird for first-degree murder" on remand).

Petitioner claims that his constitutional rights were violated by the trial court's refusal to instruct the jury on lesser included offenses of second and third degree murder at his retrial. Specifically, petitioner argues that the trial court's decision violated the Eighth Amendment as interpreted by the United States Supreme Court in *Beck v. Alabama*, 447 U.S. 625, 636-38 (1980). Pet.'s br., at 124-25.

In the time leading up to the 2007 retrial, petitioner's counsel filed a Motion to Quash Verdicts and/or Convictions seeking to set aside all of petitioner's remaining convictions. The basis for the Motion was the United States Supreme Court's decision in *Beck*, 447 U.S. at 636-38, which held that defendants being tried for a capital offense are entitled to have the jury instructed on all lesser included offenses that are supported by the evidence. N.T. Oct. 30, 2006,

54

at 68-72.  The trial court denied this Motion, and directed counsel to consider how to instruct the

jury on the fact that petitioner had already been convicted of lesser degrees of murder in

connection with killing Anthony Milano.  N.T. Oct. 30, 2006, at 83.

On the first day of the retrial, the court made the following statements to the jury:

> The defendant before you, Richard Laird, is charged with first degree
> murder. . .  The only issue that you'll have to decide during this trial is
> whether he is guilty of first degree murder.  If you decide that he is not
> guilty of first degree murder, the defendant will not be released from
> custody.  He will receive a life sentence from this Court for another degree
> of murder in connection with the death of Anthony Milano. . .  In this case
> everyone agrees or it is conceded that Anthony Milano is dead and that the
> defendant killed him.  The sole issue for your determination is whether the
> defendant did so with the specific intent to kill and with malice.

N.T. Feb. 5, 2007, at 24.  All counsel agreed to this instruction.  At the end of the guilt phase, the

court instructed the jury only on the basis of first degree murder.  N.T. Feb. 9, 2007, at 64, 75-85.

Petitioner contends that the trial court's refusal to instruct the jury on second and third

degree murder violated the rule articulated by the United States Supreme Court in *Beck*, 447 U.S.

at 636-38, that defendants being tried for a capital offense are entitled to have the jury instructed

on all lesser included offenses that are supported by the evidence. [12]  In *Beck*, the Supreme Court

---

[12] Petitioner also claims that these same facts constitute a violation of his due process rights.  Specifically,
petitioner argues that state law requiring instructions on lesser included offenses created "a protected
liberty interest by placing substantive limitations on official discretion," the violation of which supports a
federal due process claim.  Pet.'s br., at 123-24.  Respondents contend that petitioner's due process
argument based on state law was not exhausted before the Pennsylvania courts and, because of the one-
year PCRA statute of limitations, is procedurally defaulted.  Resp't br., at 120 n.37.  The Court agrees
with respondents.  Petitioner's brief before the Pennsylvania Supreme Court argued only that state law
was violated, and did not explain that this violation of state law was also intended to support a federal due
process claim.  *See* Pet.'s PASC Dir. App. br., at 22-23.  The only federal law cited by petitioner before
the Pennsylvania Supreme Court on this issue concerned his Eighth Amendment claim, which is
addressed on the merits above.  *Id.*, at 23-24.  "[A] habeas petitioner wish[ing] to claim that. . . a state
court trial denied him the due process of law guaranteed by the Fourteenth Amendment. . . must say so,
not only in federal court, but in state court." *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam).
Because petitioner said nothing before the state courts about due process in connection with the trial
court's decision not to instruct the jury on lesser included offenses, he failed to exhaust this due process
claim.  In addition, because the one-year statute of limitations under PCRA bars petitioner from returning
to state court to exhaust this claim, the claim is also procedurally defaulted, and therefore outside the

was confronted with an unusual Alabama statute that prohibited a trial court from instructing a capital jury on lesser included offenses, which had the effect of leaving the jury with "the choice of either convicting the defendant of the capital crime, in which case it [wa]s required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime." *Id.* at 628-29.  The Supreme Court ruled that the Alabama statute was unconstitutional under the Eighth Amendment because the unavailability of lesser offenses "interject[ed] irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." *Id.* at 642.  Specifically, the *Beck* court was concerned with cases in which "the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—[because] the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637.

Subsequent cases have emphasized that the rule articulated in *Beck* applies only to similar situations in which "the jury is forced into an all-or-nothing choice between capital murder and innocence." *Spaziano v. Florida*, 468 U.S. 447, 455 (1984), *overruled on other grounds Hurst v. Florida*, 136 S.Ct. 616 (2016); *see also Terry v. Petsock*, 974 F.2d 372, 378 (3d Cir. 1992) (explaining that the "central concern of *Beck* is simply not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence").

scope of this Court's habeas review.  *Keller v. Larkins*, 251 F.3d 408, 415–16 (3d Cir. 2001) (citing 42 Pa.C.S. § 9545(b)(1)).  Petitioner has made no argument to support a showing of cause and prejudice or a miscarriage of justice relating to this due process claim.  Consequently, petitioner's Motion under § 2254 on this ground is dismissed.

*Spaziano* provides an important limitation on *Beck* that is relevant to this case.  In *Spaziano*, all offenses with which the defendant could have been charged were time-barred except for first degree murder, which was governed by no statute of limitations.  468 U.S. at 450.  The trial court gave the defendant the choice between waiving the statute of limitations on the lesser offenses, in which case the jury would be instructed on them under *Beck*, or asserting the statute of limitations, in which case the jury would hear nothing of the lesser offenses.  *Id.*  The defendant chose to assert the statute of limitations and was tried on the first degree murder charge only, was convicted of first-degree murder, and argued on appeal that *Beck* required reversal of his conviction.  *Id.* at 450-54.  The United States Supreme Court rejected his argument on the ground that it would require the Court to

> divorce the *Beck* rule from the reasoning on which it was based.  The element the Court in *Beck* found essential to a fair trial was not simply a lesser included offense instruction in the abstract, but the enhanced rationality and reliability the existence of the instruction introduced into the jury's deliberations.  Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process.

*Id.* at 455 (emphasis added).  In other words, "*Beck* does not require that the jury be tricked into believing that it has a choice of crimes for which to find the defendant guilty, if in reality there is no choice."  *Id.* at 456.

In this case, the Pennsylvania Supreme Court rejected petitioner's *Beck* claim on direct review of petitioner's conviction and sentence.  *Com. v. Laird*, 988 A.2d 618, 628-29 (Pa. 2010).  That court ruled that petitioner's case was "readily distinguishable from *Beck*" for two reasons.  "First, the Commonwealth lacked authority to retry Appellant for second- or third-degree murder, as his convictions for those offenses were left undisturbed."  *Id.* at 629 (citing *Spaziano*, 468 U.S. at 455).  In addition, the Pennsylvania Supreme Court relied on the fact that "the trial court in [Appellant's] case informed the jury that an acquittal would not result in

57

Appellant being placed at liberty. . . Thus, unlike in *Beck,* the jury was aware that an acquittal of first-degree murder would result in Appellant's continued incarceration for a lower degree of murder." *Id.* at 629.

The Pennsylvania Supreme Court adjudicated this claim on the merits, and thus § 2254(d) governs the Court's review of this claim. Petitioner contends that the ruling of the Pennsylvania Supreme Court was contrary to federal law as articulated in *Beck* and *Spaziano* under § 2254(d)(1). Specifically, petitioner argues that *Spaziano* is distinguishable from this case, on the ground that *Spaziano* concerned lesser offenses that "were unavailable because the defendant strategically forfeited them." Pet.'s br., at 126. Petitioner argues that this case is different because "the lesser offenses were not 'available' only because the prosecution refused to make them so" when it opposed defense counsel's Motion to Quash his convictions for second and third degree murder. Pet.'s br., at 127. Thus, according to petitioner, the Pennsylvania Supreme Court's reliance on *Spaziano* was unreasonable and the *Beck* rule should apply to this case.

This Court rejects petitioner's narrow characterization of *Spaziano*. In that case, the United States Supreme Court explained that "*Beck* does not require that the jury be tricked into believing that it has a choice of crimes for which to find the defendant guilty, if in reality there is no choice." *Spaziano*, 468 U.S. at 456. The Court did not limit this holding to situations where the lesser offenses do not "exist" because the defendant strategically chooses to assert the statute of limitations. In short, the reason why lesser offenses are unavailable or nonexistent is irrelevant; if the jury "in reality [has] no choice" to convict the defendant of any lesser charges, then *Beck* does not require the jury to be instructed on those charges.

The Pennsylvania Supreme Court's application of *Beck* and *Spaziano* was correct. *Beck* is inapposite because petitioner's retrial did not constitute an all-or-nothing situation in which the

jury had to choose between sentencing the defendant to death or setting him free.  Rather, the jury was instructed that the result of acquitting petitioner on the first degree murder charge was a life sentence previously imposed for killing Anthony Milano.  N.T. Feb. 5, 2007, at 24 ("If you decide that [Laird] is not guilty of first degree murder, the defendant will not be released from custody.  He will receive a life sentence from this Court for another degree of murder in connection with the death of Anthony Milano."); *see also Terry*, 974 F.2d at 377-78 (concluding that *Beck* did not apply in a case when the jury knew that the defendant was already serving a life sentence for another offense).

At petitioner's retrial, lesser offenses for second and third degree murder did not "exist" because a final judgment of conviction had already been entered against petitioner on those charges.  Accordingly, *Spaziano* governs this case.  To instruct the jury on lesser included offenses would have itself resulted in a violation of the Double Jeopardy Clause of the United States Constitution.  *See, e.g.*, *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003) ("[O]nce a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense.").

The Court thus rejects petitioner's claim that his Eighth Amendment rights were violated by the trial court's refusal to instruct the jury on unavailable lesser offenses, and concludes that the decision of the Pennsylvania Supreme Court was not contrary to or an unreasonable application of federal law.  *See* 28 U.S.C. § 2254(d)(1).  Laird's Petition for relief under § 2254 on this ground is denied.

### 5.   Double Jeopardy (Claim VI)

Petitioner's final guilt phase claim is that his conviction and sentence for first degree murder at his retrial, at which time his conviction for the lesser included offense of third degree murder still stood, violated the Double Jeopardy Clause of the Fifth Amendment.  Specifically,

petitioner argues that: (1) third degree murder is a lesser included offense of first degree murder, and therefore they are the "same offense" for purposes of double jeopardy; therefore (2) his multiple convictions and punishments for the "same offense" violate the prohibition against double jeopardy.  Pet.'s br., at 116-17.

The Double Jeopardy Clause "consist[s] of three separate constitutional protections. [1] It protects against a second prosecution for the same offense after acquittal.  [2] It protects against a second prosecution for the same offense after conviction.  [3] And it protects against multiple punishments for the same offense."  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *rev'd on other grounds Alabama v. Smith*, 490 U.S. 794 (1989).  Petitioner's brief is not entirely clear regarding which of these three protections he claims was violated.  Because the record discloses that petitioner was not acquitted of any offenses, the Court will construe this claim as arising under the latter two protections, i.e. second prosecution for the same offense after conviction and multiple punishments for the same offense.

Petitioner asserted this claim before the Pennsylvania courts on direct review of his conviction and sentence.  *See* Pet.'s PASC Dir. App. br., at 18-22.  The Pennsylvania Supreme Court rejected petitioner's claim that, because he had a standing conviction for third-degree murder, he could not be retried for first-degree murder under the Pennsylvania Crimes Code §§ 109-110.  *Com. v. Laird*, 988 A.2d 618, 627-28 (Pa. 2010) (citing 18 Pa.C.S. § 109-110). Specifically, that court ruled that (1) Section 109, which prohibits a second prosecution based on the same facts "for a violation of the same provision of the statutes," did not bar petitioner's retrial for first degree murder because it is a "distinct offense[ ]" from third degree murder; and (2) Section 110, which prohibits a later prosecution for a different offense if the defendant could have been convicted of that offense when he was first prosecuted, did not apply to this situation

because it "embodie[d] a rule of compulsory joinder. . . and hence, can only logically apply in a situation where the challenged conviction is for an offense that the Commonwealth did not pursue in the initial proceedings." *Id* at 628 (internal citations omitted).

Petitioner contends that, because the Pennsylvania Supreme Court did not rule on his double jeopardy claims under federal law, this Court should address his claims *de novo*. Pet.'s br., at 120. Respondent disagrees, and argues that petitioner presented his double jeopardy claims to the Pennsylvania Supreme Court on the basis of state law only and, therefore, his federal claims are unexhausted and procedurally defaulted. Resp't br. at 111. Assuming *arguendo* that *de novo* review applies because (a) petitioner did exhaust his federal double jeopardy claims before the Pennsylvania Supreme Court and (b) that court did not adjudicate the claims on the merits, this Court determines that petitioner's double jeopardy claims are not meritorious and must be rejected. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Young v. Folino*, No. 08 Civ. 2164, 2009 WL 5178302, at *3 (E.D. Pa. Dec. 23, 2009) ("The Court retains discretion to deny a habeas petition on the merits even if it. . . contains both exhausted and unexhausted claims.").

(a.)  Re-trial for the "Same Offense"

The Court concludes that petitioner was not "twice put in jeopardy" when he was retried for first degree murder. *See* U.S. Const. amend. V. "In the case of a jury trial, jeopardy attaches when a jury is empaneled and sworn," but "'the conclusion that jeopardy has attached begins, rather than ends, the inquiry' as to whether the Double Jeopardy Clause" has been violated. *Serfass v. United States*, 420 U.S. 377, 388, 390 (1975) (quoting *Illinois v. Somerville*, 420 U.S. 458, 467 (1973)). What the Double Jeopardy Clause specifically prohibits is the following pattern of events: "once a defendant is placed in jeopardy for an offense, *and jeopardy*

61

*terminates with respect to that offense*, the defendant may neither be tried nor punished a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003) (emphasis added). Common jeopardy-terminating events include "acquittal or a final judgment of conviction." *United States v. Jose*, 425 F.3d 1237, 1240 (9th Cir. 2005).

However, there are "limited circumstances [under which] a second trial on the same offense is constitutionally permissible," *United States v. Pharis*, 298 F.3d 228, 241 (3d Cir. 2002) (citation and internal quotation marks omitted), such as when a defendant successfully appeals his conviction on the ground that a legal error was committed at trial. *Burks v. United States*, 437 U.S. 1, 15 (1978) (distinguishing reversal of a criminal conviction on appeal "for trial error" from a reversal for "evidentiary insufficiency" (citing *Ball v. United States*, 163 U.S. 662, 672 (1896)). The rationale for this rule, as articulated by the United States Supreme Court, is that "[i]t would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." *United States v. Tateo*, 377 U.S. 463, 466 (1964); *see also Burks*, 437 U.S. at 15 (explaining that, after reversal for trial error, "the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.").

Petitioner does not claim—nor could he—that his retrial for first degree murder violated the prohibition against double jeopardy because he had previously been convicted of first degree murder. This is precisely the scenario permitted by *Ball* and *Burks*: petitioner challenged his initial conviction of first degree murder by petition for writ of habeas corpus and this Court vacated the conviction due to a number of trial errors but not for any insufficiency of the evidence. *See Laird v. Horn*, 159 F. Supp. 2d 58 (E.D. Pa. 2001).

Rather, petitioner argues that his retrial for first degree murder violated the prohibition against double jeopardy because his conviction of third degree murder in the initial trial constitutes the "same offense." Petitioner relies on the rule of statutory construction in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), pursuant to which separate crimes are "separate" for double jeopardy purposes if each one "requires proof of a fact which the other does not." Pet.'s br., at 117-18. Accordingly, lesser included offenses are considered the "same" as greater included offenses because they do not require the proof of any additional elements. *See, e.g.*, *Brown v. Ohio*, 432 U.S. 161, 168 (1977). Under Pennsylvania law, as petitioner correctly notes, third degree murder is a lesser included offense of first degree murder: third degree murder requires proof that the defendant killed another person with malice aforethought, while first degree murder requires that the defendant killed with specific intent *and* malice aforethought. Pet.'s br., at 118 (citing 18 Pa.C.S. § 2502). Therefore, petitioner is correct that third degree murder is the "same offense" as first degree murder for double jeopardy purposes under *Blockburger*.

Such a determination, however, does not inevitably lead to the conclusion that the Double Jeopardy Clause was violated when petitioner was retried for first degree murder after being convicted for the "same offense" of third degree murder. Rather, there was no constitutional violation in this case for two reasons: (1) the Double Jeopardy Clause "does not prohibit the State from prosecuting [a defendant] for [greater and lesser included] multiple offenses in a single prosecution," *Ohio v. Johnson*, 467 U.S. 493, 500 (1984), as the Commonwealth did in petitioner's initial trial, and (2) as explained above, the Double Jeopardy Clause also does not prohibit retrial of charges that were reversed or vacated for trial error as opposed to evidentiary insufficiency, *Ball*, 163 U.S. at 671-72. The fact that these two events—neither of which

amounts to a constitutional violation—occurred in succession in petitioner's case does not create a new type of double jeopardy violation.

The United States Court of Appeals for the Ninth Circuit addressed a nearly identical case and reached the same conclusion. In *United States v. Jose*, the defendants were convicted at an initial trial of felony murder and predicate/lesser included offenses of armed robbery and armed burglary, and the defendants successfully appealed and obtained reversal of their felony murder convictions on the ground of trial error. 425 F.3d at 1240. The government then sought to retry the defendants on the felony murder charge. *Id*. The "case present[ed] the unique situation in which a defendant is tried on greater and lesser included offenses under the same indictment, jeopardy terminates as to the lesser offenses by virtue of final convictions, and the government seeks to retry the defendant on the greater offense after reversal." *Id.* at 1243.

The Ninth Circuit in *Jose* rejected the defendants' double jeopardy claim on multiple grounds. First, the court noted that "[t]he Double Jeopardy Clause embodies two concepts, whose aims serve as its twin rationale—'principles of finality and[. . .] prosecutorial overreaching.'" *Id.* at 1242-43 (quoting *Johnson*, 467 U.S. at 501-02). Consequently, the court ruled that neither principle had been offended: "[t]he prosecution did not overreach when it charged and tried the defendants on both felony murder and its lesser included predicates in the same trial. Similarly, the defendants had no legitimate expectation of finality in a judgment that they placed in issue by appealing." *Id.* at 1243 (internal citation omitted).[13]

---

[13] The Double Jeopardy Clause bars retrial for a greater offense only after jeopardy terminated for a lesser included offense (the "same offense") *when the offenses are charged in different indictments*. *Jose*, 425 F.3d at 1242 (citing *Brown*, 432 U.S. at 166-68). Even though petitioner's current conviction for first degree murder occurred after jeopardy terminated in connection with the third degree murder charge, petitioner was charged with both third and first degree murder in the same indictment and tried on those charges simultaneously. Because "there is a difference between separate, successive trials of greater and lesser offenses, and the different situation in which both are tried together," there was no violation of the Double Jeopardy Clause when petitioner was retried on a greater included charge (first degree murder)

The *Jose* court also rejected the defendants' double jeopardy argument because, under *Ball*, "jeopardy continues on remand" of charges reversed on appeal for trial error, "and there is accordingly no double jeopardy violation [when] the retrial is precipitated by. . . a defendant's successful reversal of conviction."  *Id.* at 1244 (citing *Ball*, 163 U.S. at 671-72); *see also Burks*, 437 U.S. at 15 n.9 (explaining that one rationale supporting "the policy of allowing retrial [of the same offense] to correct trial error" is "that the appeal somehow continues the jeopardy which attached at the first trial").  This is true even when jeopardy has terminated on other lesser or greater included charges, which are technically the "same offense."  *Jose*, 425 F.3d at 1244.; *see also United States v. Jackson*, 658 F.3d 145, 151 (2d Cir. 2011) (rejecting defendant's double jeopardy argument after defendant had been convicted of a lesser offense, but retried on a greater offense because the first jury deadlocked, on the ground that the later trials "are properly seen as continuations of the initial trial and did not expose [defendant] to double jeopardy").

This case is identical to *Jose* and, for the same reasons articulated by the Ninth Circuit, there was no violation of the Double Jeopardy Clause when petitioner was retried for first degree murder even though he was previously convicted of the lesser included offense of third degree murder.  The two constitutional protections of the prohibition against double jeopardy argued by petitioner were not violated by retrying petitioner for first degree murder: the prosecution appropriately charged petitioner with both third and first degree murder in the same indictment and tried him for those charges simultaneously in 1988, and petitioner had no legitimate expectation of finality in the final judgment of conviction on the first degree murder charge, which he successfully appealed.  *See Jose*, 425 F.3d at 1242-43.  In addition, jeopardy terminated with respect to third degree murder when the final judgment of that conviction was entered in

_____

that was originally brought in the same indictment as the lesser included offense (third degree murder) as to which jeopardy had already terminated.  *Id.* (quoting *United States v. DeVincent,* 632 F.2d 155, 158 (1st Cir. 1980)).

1988; but jeopardy "continued" with respect to first degree murder when petitioner successfully appealed his initial conviction for that offense and there was a retrial on that offense.  *See Burks*, 437 U.S. at 15 n.9; *Jackson*, 658 F.3d at 151; *Jose*, 425 F.3d at 1244.  Because the retrial did not put petitioner in jeopardy a second time, there was no constitutional violation.

Accordingly, petitioner's argument that his retrial for first degree murder violated the Double Jeopardy Clause of the Fifth Amendment on this ground is rejected.

(b.) Multiple Punishments for the "Same Offense"

The Court also concludes that petitioner's claim that his "separate convictions and sentences [for first and third degree murder] violate the protection against double jeopardy because the sentencing court 'prescrib[ed] greater punishment than the legislature intended'" must be rejected.  Pet.'s br., at 121 (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)). Petitioner is correct that the Double Jeopardy Clause "protects against multiple punishments for the same offense," *Pearce*, 395 U.S. at 717, and that, "where two statutory provisions proscribe the 'same offense' [under *Blockburger*], they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent," *Whalen v. United States*, 445 U.S. 684, 691-92 (1980).  In this context, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."  *Hunter*, 459 U.S.at 366.

This rule has no application to petitioner's case, however, because he did not receive multiple punishments.  Petitioner has only been sentenced for his conviction for first degree murder: once in 1988, which sentence was vacated by this Court on habeas review, *see Laird* 159 F. Supp. 2d 58, 131 (E.D. Pa. 2001), and again in 2007 after he was retried and convicted, N.T. Feb. 13, 2007, at 200.  Petitioner admits that the Court of Common Pleas never imposed sentence on his conviction for third degree murder.  Pet.'s Reply br., at 33; *see also Laird*, 159 F. Supp. 2d

at 68 ("On July 19, 1989, the trial court sentenced petitioner to death on the first degree murder

charge and to a consecutive sentence... on the kidnapping charge.  It does not appear that

petitioner was sentenced on any other crimes of which he was found guilty.").  Thus, petitioner

did not receive more than one punishment for the "same offense."

Nevertheless, petitioner argues that it is a "legal fiction that [he] was not formally

'sentenced' for second or third degree murder [because a] sentence of life imprisonment for

another degree of murder exists by virtue of the trial court's instruction" to the jury.  Pet.'s Reply

br., at 33.  What petitioner refers to is the trial court's explanation at the beginning of the trial:

"If you [the jury] decide that he [Laird] is not guilty of first degree murder, the defendant will

not be released from custody.  He will receive a life sentence from this Court for another degree

of murder in connection with the death of Anthony Milano."  N.T. Feb. 5, 2007, at 23.

This instruction by the trial court does not amount to cumulative sentencing.  First,

petitioner cites no authority that a trial court's comments to a jury can be treated as a sentence or

constitute punishment under the Double Jeopardy Clause.  Second, the trial court correctly

instructed the jury on this issue: depending on whether it convicted petitioner of first degree

murder, petitioner would receive one sentence (the death penalty) or another (life imprisonment),

but never both.

This Court also rejects petitioner's argument that, because "[t]here is no 'clear'

legislative intent [under Pennsylvania law] authorizing separate convictions and punishments for

a primary offense and a lesser included one," the Double Jeopardy Clause was violated in his

case.  Pet.'s br., at 118-19.  Petitioner explains that:

> Under 42 Pa.C.S. § 9765. . . multiple offenses for a single criminal act
> "merge" for sentencing purposes when "all of the statutory elements of one
> offense are included in the statutory elements of the other offense."  Under
> those circumstances, the court may sentence the defendant only on the

> higher graded offense. . . Far from reflecting a "clear legislative intent" to authorize multiple convictions[14] and punishments, state law expressly forbids them.

Pet.'s br., at 119 (internal citations omitted).

Petitioner is correct in pointing out that state law forbids multiple punishments for the same offense, but that law is inapposite to this case: petitioner's sentence complies with state law because he was never punished multiple times. As explained above, petitioner admits that he was not punished multiple times. *See* Pet.'s Reply br., at 33. Petitioner's sentence complied with 42 Pa.C.S. § 9765: his conviction for third degree murder "merged" for sentencing purposes with the greater offense of first degree murder, and petitioner was sentenced "only on the higher graded offense." Therefore, in petitioner's case, "the sentencing court [did not] prescrib[e] greater punishment than the legislature intended." *Hunter*, 459 U.S. at 366. Accordingly, petitioner's claim that his sentence violates the Double Jeopardy Clause is rejected.

For the foregoing reasons, Laird's Petition under § 2254 on the ground that the Double Jeopardy Clause was violated in his case is denied.

**B.  Penalty Phase Claims**

**1.  Penalty Counsel's Investigation and Presentation of Mitigation Evidence (Claim I)**

As the Pennsylvania Supreme Court explained, there are two aspects to petitioner's first sentencing phase claim. Specifically, petitioner contends that (1) he was deprived of effective assistance of counsel during the sentencing phase because the testimony that counsel elicited from Mark Laird, Dr. Henry Dee, Ph.D., and Dr. Robert Fox, Jr., M.D., was merely an abbreviated, and therefore less effective, version of those witnesses' testimony during the 1997 PCRA hearing; and (2) his counsel failed to investigate and present an additional expert in the

---

[14] The Court has already ruled that there is no constitutional bar to petitioner's separate convictions of lesser and greater included offenses, *supra* § IV.A.5(a.).

68

area of male sexual abuse, who could have explained to the jury a potential reason that petitioner

committed the crime charged.  Pet.'s br., 27.  For the following reasons, the Court rejects both of

these arguments.

>        (a.)  Insufficiency of 2007 Mitigation Presentation in Comparison to 1997
>              PCRA Presentation (Mark Laird, Dr. Henry Dee, Dr. Robert Fox)

Petitioner contends that counsel's presentation of mitigation evidence regarding his

mental health impairments and history as an abuse victim was inadequate compared to the way

that this evidence was presented at the 1997 PCRA hearing.  First, petitioner argues that

counsel's examination of his brother, Mark Laird, about the physical, psychological, and

emotional abuse that their father inflicted on them and their mother, and Mark Laird's

recollection of one instance in which he believed their father sexually abused petitioner, was

ineffective in comparison to Mark's 1997 testimony.  Pet.'s br., at 43-44.  Petitioner also claims

that the testimony of Dr. Dee and Dr. Fox at sentencing was inadequate when compared to the

depth and detail of the same experts' testimony at the 1997 PCRA hearing.  *Id.* at 41, 44.

The Pennsylvania Supreme Court determined that the record contradicted petitioner's

argument because trial counsel's presentation of mitigation evidence was substantially similar to

the evidence presented at the 1997 PCRA hearing.  *Com. v. Laird*, 119 A.3d 972, 992-95.  This

record distinguished petitioner's case from cases such as *Wiggins v. Smith*, 539 U.S. 510 (2003)

and *Commonwealth v. Smith*, 606 Pa. 127 (2010), in which habeas relief was granted on the

ground that counsel failed to present any mitigation evidence stemming from the defendant's

difficult past.  *Id.* at 996-97.

Petitioner argues that he is entitled to relief under § 2254(d)(2) on the ground that the

Pennsylvania Supreme Court's conclusion that the differences between Mark Laird's, Dr. Dee's,

and Dr. Fox's testimony at the 1997 PCRA hearing and at petitioner's 2007 sentencing were "not

69

extensive" was an unreasonable determination of the facts in light of the state court record. Pet.'s br., at 49.  The Pennsylvania Supreme Court addressed this argument on the merits, and thus § 2254(d) governs the Court's review of this claim.

As the Court explained above, to prevail on an ineffective assistance of counsel claim petitioner must prove both (1) that his counsel acted in an objectively unreasonable manner that (2) caused him to suffer prejudice.  *Strickland*, 466 U.S. at 687-88.  "Because this claim arises out of the sentencing phase of his trial, [petitioner] must establish actual prejudice by showing that 'there is a reasonable probability that, absent the errors, the sentencer… would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Richmond v. Polk*, 375 F.3d 309, 327 (4th Cir. 2004) (quoting *Strickland*, 466 U.S. at 695).  The Court addresses the testimony of Mark Laird, Dr. Dee, and Dr. Fox in turn.

<u>Mark Laird</u>: The Pennsylvania Supreme Court stated as follows with respect to Mark Laird's testimony at the 2007 trial:

> Mark Laird testified in the penalty phase and recounted how he and Appellant were regularly beaten by his father without provocation and for seemingly arbitrary reasons, *see, e.g.*, N.T., Feb. 12, 2007, at 70… Mark noted that Appellant was beaten more violently than himself because Appellant was the older of the two brothers…  Separately, Mark testified that he and Appellant witnessed their father violently beat their mother, leaving rooms in shambles due to household items being broken during the altercation.  Mark stated that the beatings became so severe that, when Appellant was approximately eleven years old, their mother left their father and moved to Pennsylvania to 'rebuild her life with her two sons.' *Id.* at 83. He observed that he had only isolated memories of the time period because he had 'blocked it out[.]' *Id.*
>
> As for sexual abuse, Mark testified to memories of his father and Appellant being in the bedroom with the door closed, and that when Mark opened the door for a moment he saw the two naked. *See id.* at 71–72, 82. Mark added that this was "the norm" during that period of time, albeit he clarified that at his young age he did not understand what was taking place in the bedroom. *Id.* at 83.

> Mark also testified at some length concerning Appellant's progressive, years-long descent into a pattern of alcohol and drug abuse during Appellant's adolescence. *See id.* at 85–88. Finally, Mark observed that, unrelated to the beatings by his father, there were "many" incidents in which Appellant was "hit in the head." *Id.* at 84. These included the mishap involving Appellant falling off of a moving vehicle, *see id.* at 85, as well as a separate occasion where someone struck Appellant in the back of the head with a two-by-four, causing Appellant to fall to the ground and temporarily lose his vision. *See id.* at 84–85.

*Com. v. Laird*, 119 A.3d 972, 991-92 (Pa. 2015).

The Pennsylvania Supreme Court then reviewed the transcript of Mark Laird's testimony from the 1997 PCRA hearing, which revealed that

> "Mark did provide several additional details on these and related topics [in 1997].  In particular, he testified that: their father was an alcoholic and drank frequently; their father verbally berated Mark and Appellant by calling them names and telling them they were worthless; when being physically abused, the brothers were prohibited from crying on pain of further beatings; the boys' mother would sometimes instruct them to hide from their father; the military belt was made of leather and had a large buckle; when Appellant was young he stayed with his father in Japan for a short time and returned home with a scar on his forehead due to an altercation with his father; and there was one occasion later in life when Mark learned from Appellant that the incidents in which Mark would see his father and Appellant naked in the bedroom involved sexual abuse. *See* N.T., Jan. 21, 1997, at 202–213."

*Id.* at 992.

The Pennsylvania Supreme Court determined that the additional details from Mark Laird's 1997 testimony would have "supplemented the information the jury heard," but that "the essential points regarding the severity of the physical beatings to which Appellant was subjected, the sexual abuse, and the experience of seeing his family members brutalized by his father, all formed part of Mark's testimony at the penalty hearing" in 2007.  *Id.*  That court also cited to parts of Dr. Dee's and Dr. Fox's testimony during the 2007 penalty phase in which they provided further details of physical and sexual abuse of petitioner, and relied on the fact that at least one juror found all of the mitigating factors related to this information—physical abuse; sexual

71

abuse, emotional abuse, witnessing the abuse of others, psychological consequences of abuse, substance abuse, and alcohol abuse.  *Id.* at 993.  In conclusion, the Pennsylvania Supreme Court stated this record did "not reflect that counsel's performance fell below the standard of reasonable professional assistance required by *Strickland*."  *Id.*

The Court rejects petitioner's argument that the ruling of the Pennsylvania Supreme Court was based on an unreasonable determination of the facts in light of the record.  A review of Mark Laird's testimony in 1997 and 2007 reveals that nearly identical subjects were covered, and the 2007 sentencing jury was not deprived of any significant facts concerning petitioner's background.  The Pennsylvania Supreme Court reasonably relied on the fact that at least one juror found all of the mitigating factors presented.  *See Richmond*, 375 F.3d at 328 (relying on the fact that jury found as fact the relevant mitigating factors but nevertheless decided to impose the death penalty to reject *Strickland* claim).

This Court agrees that Mark Laird's 1997 testimony was more detailed than his 2007 testimony, but it cannot be said that counsel's examination of Mark Laird in 2007 was so unreasonable that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.

The Pennsylvania Supreme Court did not reach the second prong of *Strickland* with regard to petitioner's argument based on his counsel's examination of Mark Laird.  Therefore, petitioner's argument under the second prong of *Strickland* is reviewed *de novo* by this Court.  *See Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010).  This Court concludes that petitioner suffered no prejudice as a result of the alleged errors in his counsel's presentation of Mark Laird's testimony.  As explained above, the differences between Mark Laird's testimony at the 1997 PCRA hearing and the 2007 penalty phase were minor and insignificant.  The addition of

such insignificant testimony would have been unlikely to have changed the outcome of the

penalty phase in 2007. *See Strickland*, 466 U.S. at 694 (requiring prejudice to be supported by

"a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.").

Dr. Henry Dee and Dr. Robert Fox: The Court now turns to petitioner's contention that

his trial counsel did not elicit sufficiently detailed testimony from the experts who testified

during the penalty phase, Dr. Dee and Dr. Fox.  The Pennsylvania Supreme Court compared the

1997 testimony of Dr. Dee and Dr. Fox with their 2007 testimony in both the guilt and

sentencing phases:

> In the [2007] guilt phase Dr. Dee, as noted above, discussed his evaluation
> of Appellant—which, again, was based on interviews with Appellant and
> his family members, medical and other records, and the administration of
> two batteries of tests—and stated that Appellant suffered from cognitive
> impairments resulting from brain damage, causing mental-health deficits
> including those which affected his memory functioning and executive
> functioning. In the penalty phase, he discussed at considerable length the
> graphic nature of the abuse visited upon Appellant, his brother, and his
> mother when Appellant was a young child, ultimately culminating in Mrs.
> Laird's decision to move away with her two sons.

*Com. v. Laird*, 119 A.3d 972, 994 (Pa. 2015).  Dr. Dee also testified about petitioner's alcohol

use, which had begun at a young age, and petitioner's ADHD diagnosis as a young child, which

went untreated and which led petitioner to use amphetamines as an adolescent to alleviate its

symptoms, and he diagnosed petitioner with significant brain damage from head injuries.  *Id.* at

995.  Dr. Dee "concluded to a reasonable degree of psychological certainty that, at the time of

the crime, Appellant was under the influence of an extreme mental or emotional disturbance."

*Id.* (citing 42 Pa.C.S. § 9711(e)(2)).

The Pennsylvania Supreme Court explained that Dr. Fox's testimony during the 2007

penalty phase covered similar topics as Dr. Dee's testimony, including petitioner's alcoholic

father who subjected petitioner and his mother and brother to physical and psychological abuse and sexually abused petitioner, that petitioner began drinking alcohol from a young age involuntarily when his father gave it to him, that petitioner had suffered multiple head injuries that caused a mood disorder, and that petitioner suffered from ADHD, post-traumatic stress disorder ("PTSD"), alcohol dependency, and a history of polysubstance abuse. *Id.* Dr. Fox also concluded that petitioner was suffering from an extreme mental or emotional disturbance on the night of the crime. *Id.*

The Pennsylvania Supreme Court concluded that the testimony of Dr. Dee and Dr. Fox at the 2007 trial was not significantly different from their testimony in 1997. An examination of the record shows that this conclusion was reasonable.

Dr. Dee testified at the 1997 PCRA hearing that he diagnosed petitioner with ADHD, and brain damage from multiple head injuries, and noted petitioner's history of alcohol and substance abuse. N.T. Jan. 21, 1997, at 53, 56. He also testified about his discussions with petitioner's mother, who told him about the abuse from petitioner's father, and with Mark Laird, who further explained the physical abuse and said that he saw petitioner and his father naked in a room together, which Mark Laird later realized was indicative of sexual abuse. N.T. Jan. 21, 1997, at 79-89. The doctor explained that, based on petitioner's brain damage alone, petitioner's ability to conform his conduct to the requirements of the law would have been impaired and, when the effects of petitioner's brain damage were combined with the effects of petitioner's dysfunctional childhood, ADHD, and ingestion of a large amount of alcohol, petitioner was even more substantially impaired. N.T. Jan. 21, 1997, at 123-27. As the Pennsylvania Supreme Court recounted, this history and diagnoses are nearly identical to the history and diagnoses about which Dr. Dee testified in 2007 at both the guilt and penalty phases.

74

At the 1997 PCRA hearing, Dr. Fox testified that petitioner had severe and untreated forms of PTSD and ADHD, the symptoms of which he self-medicated with alcohol and amphetamines, and that petitioner suffered from head injuries and associated brain damage.  He went on to explain that petitioner developed PTSD after being abused by his father and witnessing his father's abuse of his mother and brother.  N.T. Jan. 22, 1997, at 43-44, 48-50, 112-116.  Dr. Fox's testimony from the 1997 PCRA hearing was more detailed because he testified for nearly two days, often proceeding in an almost narrative form with little direction from counsel.  Petitioner's trial counsel cannot be faulted for choosing not to replicate all such testimony before a jury and during the guilt and penalty phases of the 2007 trial that, combined, lasted seven days.

Moreover, the Pennsylvania Supreme Court's disposition of this claim was not an unreasonable application of federal law.  *See* 28 U.S.C. § 2254(d)(1).  That court distinguished Laird's case from the precedent he relied upon to argue that his counsel's presentation of expert testimony during the penalty phase was unreasonable.  *Laird*, 119 A.3d at 996 (citing *Wiggins v. Smith*, 539 U.S. 510 (2003), *Com. v. Smith*, 995 A.2d 1143 (2010)).  In both *Wiggins* and *Smith*, counsel was aware that their clients had suffered from abusive childhoods and other difficulties but made no attempt to investigate their clients' backgrounds and ultimately presented no evidence on that subject during the penalty phases of their respective trials.  *Wiggins*, 539 U.S. 516-17; *Smith*, 995 A.2d at 1172.  The Supreme Court of the United States granted habeas relief in *Wiggins*, and the Pennsylvania Supreme Court did the same in *Smith*, on the ground that counsel unreasonably failed to investigate their clients' backgrounds for potentially significant mitigation evidence.  As explained by the Pennsylvania Supreme Court, these cases are distinguishable on the ground that petitioner's counsel investigated his background and mental

impairments and presented significant substantive testimony on that subject.  *Laird*, 119 A.3d at

996-97 ("[C]ounsel employed four expert witnesses and ensured that two of them provided

extensive and detailed testimony in the penalty phase concerning Appellant's abusive childhood,

his subsequent head injuries, his mental-health impairments, and the effects all of these factors

had on his cognitive functioning. Further, the jury was instructed that these experts' guilt-phase

testimony was part of the penalty phase through incorporation, so that their cumulative penalty

phase testimony was even more detailed.").

A review of relevant federal case law reveals that the decision of the Pennsylvania

Supreme Court was not contrary to federal law.  *See* 28 U.S.C. § 2254(d)(1).  The cases in which

federal courts have granted habeas relief on the ground that counsel's use of experts during the

mitigation phase of a capital case arose out of far more extreme circumstances than the alleged

errors in petitioner's case.  *Compare Johnson v. Bagley*, 544 F.3d 592, 600-606 (6th Cir. 2008)

(reversing state court's denial of habeas relief and holding that defense attorneys failed to

adequately prepare their mental health expert, who gave testimony damaging to the defendant

during the mitigation phase, because they failed to properly investigate defendant's background

of abuse and mental impairment), *and Stevens v. McBride*, 489 F.3d 883, 896-98 (7th Cir. 2007)

(reversing state court's denial of habeas relief on the ground that trial counsel was unreasonable

in presenting mental health expert, who had testified during guilt phase that the defendant

suffered from no mental impairments, again at penalty phase when counsel thought the expert

was a "quack" and had no idea how the expert would testify), *with Pietri v. Fla. Dep't of Corr.*,

641 F.3d 1276, 1284-88 (11th Cir. 2011) (upholding state court's conclusion that counsel could

not be held deficient when "the evidence ultimately presented at trial encompassed the material

for which [petitioner] now asserts fault with counsel."), *and Sims v. Brown*, 425 F.3d 560, 586

n.17 (9th Cir. 2005) (holding counsel acted reasonably in relying on qualified experts to properly diagnose defendant and give favorable testimony and collecting cases in which courts found deficient performance regarding the use of experts).

As a final point on this issue, the Court notes that petitioner received a significantly more effective presentation of mitigation evidence at his 2007 retrial than he did at his original 1988 trial.  In 1988, petitioner's counsel conducted no inquiry into his background and medical history in connection with the penalty phase and presented no mental health experts during sentencing, allegedly "because his defense and that of his client was not guilty."  *Laird v. Horn*, 159 F. Supp. 2d 58, 115 (E.D. Pa. 2001).  The only evidence presented in mitigation at the 1988 trial was petitioner's young age at the time of the offense, his lack of a history of violent crimes, his state of intoxication, his role as a devoted father, and the fact that he was the son of a career officer in the Marine Corps.  *Id.* at 116.  This Court determined that the Pennsylvania Supreme Court's ruling that petitioner's counsel made a reasonable strategic decision not to develop additional mitigation evidence at the 1988 trial was clearly erroneous and that petitioner's counsel failed to properly investigate his background and marshal appropriate expert testimony in defense of his life.  *Id.*  Indeed, the circumstances of petitioner's 1988 trial are significantly similar to the deficient investigations that warranted habeas relief in *Wiggins* and other cases discussed above.

The Court concludes that the Pennsylvania Supreme Court's rejection of this argument was not contrary to federal law or an unreasonable determination of the facts in light of the record, and thus rejects petitioner's argument that his counsel was ineffective in presenting mitigation evidence during the penalty phase of his 2007 trial.

(b.) <u>Failure to Call Additional Expert in Male Sexual Abuse</u>

Petitioner further argues that his counsel was ineffective for failing to present an additional mitigation expert to investigate and diagnose the psychological effects of sexual abuse

on male victims.  It is petitioner's position that, even though his attorneys knew that he had been

sexually abused by his father, "counsel made no attempt to develop or present that information,

either from Petitioner himself, from the experts who testified…, or from a[n additional] specialist

in childhood sexual abuse."  Pet.'s br., at 40.  Petitioner points to the testimony of clinical

psychologist Dr. David Lisak, Ph.D., a defense witness at his 2012 PCRA hearing, as the type of

expert testimony that his penalty phase counsel should have developed.  *Id.* at 44-47.  In sum, he

claims that he was prejudiced by his counsel's failure to "connect the dots" between his history

as a victim of sexual abuse and the "hate crime" for which the Commonwealth sought the death

penalty because an effective presentation of mitigation evidence could have convinced at least

one juror to vote for a life sentence.  *Id.* at 50.

> The Pennsylvania Supreme Court summarized Dr. Lisak's testimony as follows:

> > "A review of the post-conviction record reveals that Dr. Lisak related several examples of violence that were not mentioned at trial, such as an incident in which Appellant and his brother witnessed an apparent attempt by their father to strangle their mother with his hands.  *See* N.T., May 24, 2012, at 113.   Dr. Lisak was also able to provide some additional perspective concerning the level of vulnerability felt by children who are [sexually] abused—particularly by a parent to whom they would ordinarily look for protection—and the tendency of [sexually] abused boys to deal with such feelings of vulnerability by adopting what the expert termed a hyper-masculine persona as they progress into adolescence.  *See* N.T., May 24, 2012, at 115."

*Com. v. Laird*, 119 A.3d 972, 997-98 (Pa. 2015).  That court then characterized this testimony as

"largely cumulative of that provided by Drs. Dee and Fox, as well as Mark Laird, all of whom

informed the jury about the nature and severity (and several examples) of the physical and sexual

abuse Appellant suffered at the hands of his father."  *Id.*  The Pennsylvania Supreme Court

concluded that petitioner failed to demonstrate he was prejudiced by his counsel's failure to

present the "cumulative" testimony because at least one juror found all of the mitigating factors

proffered by the defense, which included, *inter alia* physical abuse, sexual abuse, emotional

abuse, witnessed the abuse of others, and psychological consequences of abuse, and therefore the outcome of a sentencing proceeding with Dr. Lisak's testimony would not have been different. *Id.* at 998-99.

Petitioner challenges the conclusion of the Pennsylvania Supreme Court that he suffered no prejudice from counsel's failure to present an expert in sexual abuse on the ground that the Pennsylvania Supreme Court unreasonably discounted the significance that the jury would have attached to the testimony from an expert in sexual abuse.

The Pennsylvania Supreme Court addressed this argument on the merits, and thus § 2254(d) governs the Court's review of this claim. The Court concludes that this summary by the Pennsylvania Supreme Court was a fair characterization of Dr. Lisak's testimony in light of the record. It is true that much of Dr. Lisak's testimony was similar to that provided by Dr. Dee and Dr. Fox. *Compare, e.g.* N.T., May 24, 2015, at 50, 118 (Lisak concluded that petitioner was a victim of sexual abuse by his father and that petitioner self-medicated his trauma symptoms with alcohol and amphetamines from a young age), *with* N.T. Feb. 13, 2007, at 17, 47 (Fox testified that petitioner told him one week prior to trial that he had been sexually abused and explained that testing results supported the fact that Laird was telling the truth about being abused), *and id.* at 59, 77-78 (Dee testified that Laird was sexually abused and that he self-medicated the symptoms of his ADHD with amphetamines). However, some of Dr. Lisak's testimony at the 2012 PCRA hearing was not cumulative of the testimony presented at the 2007 trial. For example, in contrast to the evidence of a single incident of potential sexual abuse that was presented to the jury in 2007, Dr. Lisak testified that petitioner revealed to him that he was sexually abused by his father on a regular basis from the age of about five until his mother moved with him to Pennsylvania, around the age of eleven. N.T., May 24, 2012, at 112-113.

79

Moreover, Dr. Lisak testified that the psychological harm to petitioner was likely magnified by the fact that his father was the perpetrator of the abuse, and that petitioner's experiences as a victim were corroborated by his life-long aversion to being physically touched by other men. N.T., May 24, 2012, at 121, 201, 208.  No evidence of this nature was presented at petitioner's 2007 trial.

The Court determines that the Pennsylvania Supreme Court reasonably concluded that petitioner suffered no prejudice from the fact that a sexual abuse expert was not called as a witness on the ground that this testimony was not "reasonably likely to have convinced a juror to alter his or her balancing of the mitigating circumstances against the kidnapping aggravator." *Laird*, 119 A.3d at 998.  In addition to the comparison of Dr. Lisak's testimony with that of Dr. Dee and Dr. Fox, set forth above, to demonstrate that the 2007 jury heard about the psychological consequences of petitioner's history as a victim of sexual abuse, the Pennsylvania Supreme Court properly relied on the fact that at least one juror found sexual abuse to be proven by a preponderance of the evidence in concluding that the testimony presented during sentencing sufficiently established that petitioner was, in fact, sexually abused.  *Id.*, at 997; *see also Richmond*, 375 F.3d at 328 (relying on the fact that jury found as fact the relevant mitigating factors but nevertheless decided to impose the death penalty to conclude that the repetitive testimony of an additional expert was unlikely to "result[ ] in the jury balancing differently the mitigating and aggravating factors and concluding that a death sentence was not warranted"). The fact that at least one juror found as fact that petitioner was a victim of sexual abuse decreases the likelihood that the outcome of the penalty proceeding would have been different if the jury had heard Dr. Lisak's testimony confirming that petitioner was a victim of sexual abuse and that he was abused on multiple occasions.

The determination of the Pennsylvania Supreme Court is further supported by counsel's closing argument during the penalty phase, which covered many of the subjects that petitioner claims were missing from the 2007 trial.  Specifically, counsel argued that he had proven by a preponderance of the evidence—the required standard—that petitioner was, in fact, sexually abused by his father, and rhetorically asked the jury "[w]hat kind of person does [sexual abuse by their own father] create?  A person who, obviously, can no longer function on the streets of this world. . . We are all a product of our childhood. We can't get away from it.  Some of us rise above it, some of us don't.  And just because we don't doesn't mean we deserve the death penalty when we commit a crime."  N.T., Feb. 13, 2007, at 149-50.  While an attorney's closing argument does not constitute evidence, penalty counsel's words to the jury covered issues similar to those testified to by Dr. Lisak at the 2012 PCRA hearing.[15]

For the reasons stated above, the Court concludes that the decision of the Pennsylvania Supreme Court was reasonable and rejects petitioner's claim that his penalty phase counsel was ineffective in investigating and presenting mitigation evidence, and denies Laird's Petition under § 2254 on this ground.

---

[15] The Pennsylvania Supreme Court did not reach the first prong of *Strickland* with regard to petitioner's claim that an expert like Dr. Lisak should have been utilized during the penalty phase.  This Court reviews petitioner's claim under the first prong of *Strickland de novo*.  *See Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010).  The Court determines that petitioner's trial counsel did not act unreasonably in not securing an additional expert in the area of male sexual abuse.  At the hearing on post-conviction relief, Mr. Keith Williams, petitioner's trial attorney who was primarily responsible for the penalty phase in 2007, testified that an additional expert like Dr. Lisak could have provided more evidence corroborating petitioner's claim that he was sexually abused, but that "it never crossed [his] mind to" engage an additional expert who "was more capable of getting under Mr. Laird's skin."  Instead, Mr. Williams relied on Dr. Dee and Dr. Fox and on what petitioner and his brother had told counsel about the sexual abuse during counsel's investigation.  N.T., May 23, 2012, at 165.  "[A]ttorneys are entitled to rely on the opinions of mental health experts" as sufficiently complete explorations of all potential areas of mitigation that those experts are qualified to diagnose.  *Sims v. Brown*, 425 F.3d 560, 585-86 (9th Cir. 2005); *see also Harrington v. Richter*, 562 U.S. 86, 107 ("Even if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it.").  Accordingly, the Court concludes that petitioner's counsel did not act unreasonably in relying on Dr. Dee and Dr. Fox to testify about the effects of sexual abuse on petitioner's psychological health.

### 2.   Victim Impact Evidence (Claim III)

In capital cases arising out of events that occurred before 1995, Pennsylvania law prohibits the introduction of victim impact evidence during the penalty phase.  *See* 42 Pa. C.S. § 9711; *Com. v. Young*, 748 A.2d 166, 185 (Pa. 2000); *accord Com. v. Fisher*, 681 A.2d 130, 145 (Pa. 1996).  This rule is inapplicable to the guilt phase of such trials.

At petitioner's 2007 trial, both parties and the court agreed that this rule governed petitioner's case, and the trial court granted petitioner's motion *in limine* to preclude the admission of such evidence during the penalty phase.  N.T. Oct. 30. 2006, at 138-39, 147. During the guilt phase, the prosecutor elicited some testimony that, according to petitioner, was victim impact evidence, which was permissible under the law applicable at that time.  After the guilt phase ended, petitioner's trial counsel and the prosecutor agreed to incorporate the entire record from the guilt phase into the record for the penalty phase, and the prosecution introduced no new evidence during the penalty phase.  Thus, the alleged victim impact evidence that was introduced during the guilt phase was incorporated into the sentencing phase record.

Petitioner claims that his counsel was ineffective because he permitted victim impact evidence admitted during the guilt phase to be incorporated into the sentencing record.  Pet.'s br., at 61.  Petitioner argues that he was prejudiced when the prosecutor emphasized this evidence in her closing argument to the jury at the end of the penalty phase, which led the jury to improperly consider evidence that was inadmissible for the purpose of sentencing him.  Pet.'s br., at 62, 70.

According to petitioner, the following testimony from the guilt phase constituted victim impact evidence and was inappropriately incorporated into the sentencing record:

- The victim's father, Vito Milano's, testimony that "before Anthony Milano's death he lived with his wife and Anthony, but then Anthony was killed and his wife 'died thirteen years ago' and 'now I'm living by myself.' NT 2/5/07, 48-49. He testified that 'Anthony was 26 years old. He was going to Art Institute in Philadelphia. He finish the school and

graduated with honor roll.' *Id*. at 49. He related his sad last encounter with his son: 'He said good night, daddy. I said no stay out too late. . . . I never see my son alive from that night. I never see him alive.' *Id*. at 51." Pet.'s br. at 62-63;

- Testimony from Orpha Newswanger, who was with Milano earlier that night, that "1) Anthony Milano was a friend from the Mennonite church in Levittown; 2) he attended 'Bible studies' sessions she organized; 3) he participated in 'reading scriptures' on the night of his death; 4) the topics of that night's session were 'learning to become a servant' and 'peace-making'; and 5) he was hungry and she gave him some chocolate cake and she did not 'ever see [her] friend again.' NT 2/5/07, 67-70." Pet.'s br. at 63;

- Melanie Ozdemir's testimony that "Anthony Milano was a 'real good friend' and had been for 'a long time' before he was killed. NT 2/6/07, 126." Pet.'s br. at 63.

Petitioner also claims that the prosecutor improperly emphasized the victim impact evidence during her statements opening and closing both the guilt and penalty phases, as follows:

- The prosecutor's opening statement for the guilt phase stated: "[In] December, 1987, Anthony Milano was a 26-year-old young man with his whole life ahead of him. Anthony was a recent graduate from Philadelphia Art School with honors. He had a future ahead of him filled with promise. Anthony was a beloved son of Vito Milano and Rose Milano, his parents. Anthony was a friend and a brother to his sister Anne Marie. Anthony was and he is no more," and "[W]hen Anthony didn't come home that night, his parents were concerned." Pet.'s br. at 62 (quoting N.T. Feb. 5, 2007, at 27, 35) (alteration in original);

- The prosecutor's closing argument during the guilt phase ended "with a plea for 'justice [in] this world where Anthony Milano is a beloved son, a memory of a beloved son to his father" and "Anthony Milano in his sister's heart is still a friend and brother.' NT 2/9/07, 58." Pet's brief at 63 (alteration in original);

- The prosecutor's closing argument during the sentencing phase "told the jury Petitioner 'took a life filled with promise and future away from' Anthony Milano, and prevented him from 'go[ing] home that night to his family.' NT 2/13/07, 129, 134. She told the jury that Petitioner's stipulation to his involvement in the murder spared the family no pain because 'the Milanos [i.e., Anthony Milano's father and sister] had to sit here again and listen to what happened to their son in

that dark, cold woods.' *Id*. at 125."  Pet.'s br. at 63-64 (alteration in original).

The Pennsylvania Supreme Court concluded that this testimony did not constitute victim impact evidence and that the prosecutor's comments did not exceed the bounds of permissible argument.  *Com. v. Laird*, 119 A.3d 972, 1010-12 (Pa. 2015).  Instead, that court determined that most of the evidence was admissible life-in-being or background testimony from witnesses who testified about Milano's whereabouts before he went to the Edgely Inn or who identified Milano's personal belongings found by the police in petitioner's possession after the crime.  *Id.* at 1010.  Newswanger's testimony "that Anthony Milano had listened to a tape and read Bible passages relating to peacemaking. . . c[a]me[ ] closest to straying beyond what was permissible for evidentiary purposes," but the Pennsylvania Supreme Court ultimately concluded that this evidence was not prejudicial to petitioner because "it was, within the proceeding as a whole, *de minimus* [sic] and insufficient to undermine our confidence in the outcome of the sentencing hearing."  *Id*.  The Pennsylvania Supreme Court also determined that, while some of the prosecutor's comments were unnecessary, they were not "evidence" that is inadmissible under state law and were "within the latitude afforded to a district attorney in making her arguments." *Id.* at 1012.

Much of petitioner's argument regarding this claim is devoted to challenging the ruling of the Pennsylvania Supreme Court that this evidence was not inadmissible victim impact evidence under Pennsylvania law.  Pet.'s br., at 69-70.  Petitioner claims that this conclusion was unreasonable in light of the record.  *Id.*  This argument is not cognizable, however, because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The United States Court of Appeals for the Third Circuit has held that "evidentiary errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." *Bisaccia v. Att'y Gen. of New Jersey,* 623 F.2d 307, 312 (3d Cir. 1980). "To constitute the requisite denial of fundamental fairness sufficient to issue a writ of habeas corpus, the erroneously admitted evidence must be material in the sense of a crucial, critical, highly significant factor, and the probative value of the evidence must be so conspicuously outweighed by its inflammatory content that a defendant's constitutional right to a fair trial has been violated." *Peterkin v. Horn,* 176 F. Supp. 2d 342, 364 (E.D. Pa. 2001) (internal quotation marks omitted).

Petitioner has failed to demonstrate that the challenged victim impact evidence was "crucial, critical, [or] highly significant" in light of the totality of the evidence admitted at his trial or that its probative value was "conspicuously outweighed by its inflammatory content." *Id.* This minimal testimony was presented early during the five-day guilt phase and, in the context of the totality of the evidence that the jury heard about the crime and about petitioner as an individual, was unlikely to have influenced the jury over one week later at the end of the penalty phase. Petitioner has also failed to demonstrate that the prosecutor's argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (citation omitted). "Viewed in the context of the entire penalty proceeding, . . . the challenged comments [by the prosecutor] were brief, isolated

remarks" that did not "exceed[ ] constitutional bounds."  *Wharton v. Vaughn*, No. 01 Civ. 6049,

2012 WL 3535866, at *66 (E.D. Pa. Aug. 16, 2012).

Petitioner has failed to show that the admission of the challenged evidence deprived him

of fundamental fairness.  The determination of the Pennsylvania Supreme Court that the

challenged evidence was not, in fact, inadmissible victim impact testimony is not cognizable on

federal habeas review under the circumstances presented in this case.  Because "counsel cannot

be deemed ineffective for failing to raise a meritless claim," *Werts v. Vaughn*, 228 F.3d 178, 203

(3d Cir. 2000), this Court concludes that petitioner was not deprived of the effective assistance of

counsel under *Strickland* when his trial lawyer failed to object to the admission of such

testimony on state law grounds.

Petitioner further claims that his counsel's failure to prevent the admission of this

evidence prejudiced his rights to a fair sentencing under the Eighth Amendment and to due

process under the Fourteenth Amendment.  Respondents contend that these arguments were not

fairly presented to the state courts and therefore are not exhausted and are procedurally

defaulted.  Specifically, respondents argue that petitioner only claimed that his attorney's actions

were deficient and that he suffered prejudice under *state law*, without reference to any federal

constitutional rights.  Thus, according to respondents, any Eighth Amendment or due process

claim based on the admission of victim impact evidence is not exhausted and is procedurally

defaulted, and therefore cannot be reviewed by this Court.  Resp't br., at 67.

In his Reply, petitioner argues that his constitutional claim was fairly presented to the

state courts because (1) his initial PCRA petition in the Court of Common Pleas stated that "the

jury's sentencing decision was tainted by improper 'victim impact' information," which entitled

him to relief on "the underlying constitutional claim that *due process* required Petitioner to be

adjudged by a jury untainted by improper evidence," and (2) he "cited several state court opinions in both his PCRA petition and Pennsylvania Supreme Court brief that addressed whether the introduction of victim impact evidence prior to the 1995 amendment interjected an impermissible and unconstitutional factor into the jury's sentencing decision."  Pet.'s Reply br., at 24-25 (emphasis in original).

The Court agrees with respondents: petitioner failed to exhaust his claim that the admission of victim impact evidence and the prosecutor's related argument violated his rights under the Eighth and Fourteenth Amendments, and thus this claim is procedurally defaulted. First, the fact that petitioner alluded to his federal constitutional rights in his initial PCRA petition is insufficient, standing alone, to exhaust this claim; rather, petitioner must "afford *each level of the state courts* a fair opportunity to address the claim." *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir. 1996) (emphasis added).  Unlike petitioner's PCRA petition in the Court of Common Pleas, his appeal brief to the Pennsylvania Supreme Court contains no reference to due process or the Eighth Amendment in the context of this claim.  Moreover, the "passing reference" to jury tainting and due process in the initial PCRA petition is insufficient to notify a state court that a federal claim is being raised.  *Keller v. Larkins*, 251 F.3d 408, 415 (3d Cir. 2001) (citing *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam)) (holding that "passing reference to the concept of a 'fair trial'" is insufficient to exhaust a federal due process claim).

Second, the Court rejects petitioner's argument that he exhausted this claim by "rel[ying] on state cases employing constitutional analysis in like fact situations."  *Nara v. Fran*k, 488 F.3d 187, 198 (3d Cir. 2007), *as amended* (June 12, 2007) (citing *McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999)); *see* Pet.'s br. at 24-25.  In his brief to the Pennsylvania Supreme Court, petitioner relied on the following cases to argue that his counsel was ineffective: *Commonwealth*

*v. Fisher*, 681 A.2d 130 (Pa. 1996), *Commonwealth v. McNeil*, 679 A.2d 1253 (Pa. 1996), and

*Commonwealth v. Young*, 748 A.2d 166 (Pa. 2000).  Pet.'s PASC br., at 41-44.  Contrary to

petitioner's argument, these cases do not employ federal constitutional analysis in a manner that

would have alerted the Pennsylvania Supreme Court to the fact that petitioner was asserting a

federal claim.  Rather, these cases explicitly address the question whether *Pennsylvania law*

prohibits the admission of victim impact evidence, in view of the decision of the Supreme Court

of the United States in *Payne v. Tennessee*, 501 U.S. 808, 824-25 (1991), that the federal

constitution permits the admission of such evidence during capital sentencing.

For example, in *Fisher*, the Pennsylvania Supreme Court considered whether, "[i]n light

of the decision in *Payne*, . . . *our capital sentencing scheme* would permit the admission of

relevant 'victim impact' testimony," and applied state principles of statutory construction to the

Pennsylvania Sentencing Code.  *Fisher*, 681 A.2d at 146 (emphasis added) (citing 42 Pa.C.S.

§ 9711(a)(2)); *see also McNeil*, 679 A.2d at 1259 (granting relief on ineffective assistance of

counsel claim on the ground that, "at the time of the penalty hearing, Frinzi's testimony

concerning the victim's generosity and kindness was inadmissible" under Pennsylvania state

law); *Young*, 748 A.2d at 185 (same, on the ground that *Fisher* and *McNeil* held that victim

impact evidence was inadmissible under pre-1995 version of 42 Pa.C.S. § 9711(a)(2)).

None of these cases address the question whether victim impact testimony admitted

during capital sentencing violated the defendant's federal constitutional rights.  Rather,

petitioner's reliance on these cases supports the state law argument he made before the state

courts: that the challenged evidence "is precisely the type of information that was not permitted

under the pre-1995 [Pennsylvania] statute," with no mention of how the admission of such

evidence affected his federal rights to due process or a fair trial.  Pet.'s PASC br., at 46.

Consequently, petitioner's reliance on these decisions in his brief before the Pennsylvania Supreme Court is insufficient to have "fairly presented" his federal constitutional claims to the state courts.

This Court concludes that petitioner's claim that his trial counsel was ineffective for failing to object to the introduction of this evidence on the ground that the evidence violated his Eighth Amendment right to a fair trial and his Fourteenth Amendment right to due process is not exhausted. Moreover, this claim is procedurally defaulted because petitioner is barred from returning to the state court to litigate the federal grounds of this claim by the one-year PCRA statute of limitations. *Keller*, 251 F.3d at 415-16 (citing 42 Pa.C.S. § 9545(b)(1)).

Petitioner can only excuse the procedural default of this claim by demonstrating cause and prejudice or a fundamental miscarriage of justice. *Supra*, at 10-11 (citing *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000)). Petitioner has failed to do so: he does not allege that any "objective factor external to the defense impeded counsel's efforts to comply with the State's" one-year statute of limitations, *Werts v. Vaughn*, 228 F.3d 178, 193 (3d Cir. 2000), and there is no reason to believe that the "factual or legal basis for [this] claim was not reasonably available to counsel." *Id.* This Court has already explained, *supra*, that petitioner has not demonstrated prejudice caused by the admission of the testimony challenged as victim impact evidence or from the prosecutor's argument. Finally, petitioner has presented no new evidence of actual innocence to demonstrate that failure to review this claim would result in a fundamental miscarriage of justice. *See Keller*, 251 F.3d at 415-16. Consequently, the Court will not consider petitioner's claim that his federal constitutional rights were prejudiced by his counsel's failure to object to the admission of the alleged victim impact evidence at sentencing.

For these reasons, Laird's Petition for relief under § 2254 on the ground that his trial counsel was ineffective in permitting alleged victim impact testimony to be incorporated into the sentencing record is dismissed.

### 3.   "Prior Bad Acts" Evidence (Claim IV)

Petitioner next claims that his trial counsel was ineffective because he allowed "inadmissible and highly prejudicial evidence of Petitioner's prior bad acts" on the night of the crime to be admitted during the guilt phase of his trial, which was then incorporated into the sentencing record. Pet.'s br., at 74. Specifically, the prosecution elicited testimony from a number of witness that, while at the Edgely Inn on the night of the offense, petitioner provided alcohol to a young child and made sexual advances to Gale Gardner, who was seventeen years old at the time. Petitioner argues that his counsel should have filed a pre-trial motion *in limine* to exclude this testimony, objected to the evidence at trial, requested a cautionary instruction, or moved for a mistrial on the ground that evidence of a criminal defendant's prior bad acts is inadmissible. *See* Pa. R. E. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). Because the entire trial record was incorporated into the record at sentencing, and because (according to petitioner) the prosecutor "capitalized on this evidence" during her closing argument, petitioner claims that his counsel's failure caused him to suffer prejudice at sentencing.[16] Pet.'s br., at 81-84.

---

[16] Petitioner argued to the Pennsylvania Supreme Court that the prior bad acts evidence prejudiced him at both phases of the trial, and the Pennsylvania Supreme Court adjudicated both of these claims on the merits. *See Laird*, 119 A.3d at 986-87, 1004-05. Petitioner's brief before this Court titles this claim "Trial Counsel Was Ineffective *At Sentencing* When He Failed to Object to the Admission of Prejudicial and Inflammatory Evidence," Pet.'s br., at 73 (emphasis added), but argues that the admission of the prior bad acts testimony entitles petitioner to relief from both his conviction and sentence, *id.*, at 87. The substance of the argument in petitioner's brief focuses on the prejudice that petitioner suffered at sentencing and challenges the determination of the Pennsylvania Supreme Court as it relates to the

Specifically, petitioner claims that the incorporation of the following testimony from the guilt phase into the sentencing record caused him to suffer prejudice.  The Court notes that the guilt phase record was not read into the record at sentencing, but was incorporated in its entirety by stipulation of the parties.  Petitioner first points to evidence that, while at the Edgely Inn, he gave his then-fiancée's, Barbara Parr's, nine-year old son alcohol that caused him to vomit.  Parr testified on direct examination as follows:

> Q: What did you do when you were at the bar?
> A: My son was there and he had been drinking
> Q: What do you mean by that?
> A: He was sick. He was drunk. They had given him alcohol.
> > **Mr. Kerrigan**: Objection.
> > **The Court**: Sustained. The jury shall disregard the part that they had given him alcohol. She can testify as to the observation that he was drunk and he was getting sick.
> Q: Well, did Rick Laird say anything to you about giving him alcohol?
> A: Yeah.
> Q: What did he say?
> A: That they had given it to him, him and Frank.
> Q: And what kind of alcohol was it?
> A: I don't remember.
> Q: When you say your son was sick, what do you mean?
> A: He was vomiting.
> Q: Were you upset about that?
> A: Yes.

N.T. Feb. 6, 2007, at 69-70.

Gale Gardner also testified on this topic.  On direct examination, she testified:

> Q: And when you got back to the Ambassador Arms apartment, do you recall what you did?
> A: Yeah. I sat and listened while the child became ill and well, she [Parr] tried to care for the child.
> Q: And did you know why the child was sick?
> A: I do.
> Q: Why was that?
> A: He was drinking at the bar.

---

penalty phase.  Therefore, the Court limits its review of this claim to the prejudice that petitioner claims he suffered at sentencing.

N.T. Feb. 7, 2007, at 29 (alteration added).  Petitioner further faults his counsel for eliciting the

following testimony from Gardner on cross-examination:

> Q: Did you see him [Laird] drinking shots?
> A: I don't remember. I remember the child was drinking.
> Q: You remember the child was drinking?
> A: I remember from the vomiting later in the evening.
> Q: You remember the child was drinking. Who was the child with at the bar?
> A: Barbara and Rick and Frank and I.
> Q: And the child was drinking at the bar while you all were there?
> A: I know he was vomiting later and everybody was talking about he was drunk from Wild Turkey or something.
> Q: Wild Turkey?
> A: Mm-hmm.
> Q: Do you know what Wild Turkey is?
>     **Ms. Henry**: Objection.
> A: Something that makes a child vomit.
>     **The Court**: I'm sorry
>     **Ms. Henry**: I'll withdraw it.
> A: Something that makes a child vomit.
> Q: Is Wild Turkey alcohol?
> A: I imagine it is.
> Q: Did you see the child drinking?
> A: No, I just remember listening to them talk about it later.
> Q: But did you see the child drinking at any time while you were with him?
>     **Ms. Henry**: Objection, asked and answered.
>     **The Court**: This is cross-examination.
> A: No, I don't remember. No, I don't think so.

N.T. Feb. 7, 2007, at 48-49 (alteration added).

    Petitioner also claims that he was prejudiced by the admission of evidence that he "was

heard to make sexually explicit comments to Gale Gardner, who was seventeen years old" at the

time, while petitioner was "in the company of his eight-month pregnant fiancée."  Pet.'s br., at

78.  On this subject, Gardner testified:

> Q: Did you have a conversation or did Rick Laird say something to you at that bar?
> A: He did.
> Q: Do you recall what he said?
> A: I do.
> Q: Tell us what he said.

> A: He said that he wanted to run his tongue across my teeth.
> Q: And had you ever met Rick Laird before?
> A: I hadn't.

N.T. Feb. 7, 2007, at 28.  Alan Hilton, who was also at the bar, testified that petitioner had said

to Gardner "[s]omething about going home and having sex or having sex with him something

around that."  N.T. Feb. 6, 2007, at 28.

Finally, petitioner argues that his sentencing was unfair because the prosecutor

"capitalized on this evidence when she told the jury: 'And then the final, the catchall [mitigation

factor], is any other evidence of mitigation concerning the character and the record of the

defendant and the circumstances of his offense.  Well you already know a lot about Richard

Laird's character, I submit to you.'"  Pet.'s br., at 79 (quoting N.T. Feb. 13, 2007, at 124)

(alteration added).

The Pennsylvania Supreme Court rejected this claim on the ground that petitioner did not

prove that he was prejudiced by the inclusion of this evidence from the trial phase into the

sentencing record.  The court "observed that the evidence about which Appellant presently

complains was isolated and minor within the context of a five-day murder trial, particularly when

compared to the other conduct to which Appellant stipulated—most notably, that he had

participated in a brutal murder and that he had been convicted of kidnapping the victim."  *Com.*

*v. Laird*, 119 A.3d 972, 1005 (2015).  That court rejected petitioner's argument that the

prosecutor's summation was improper because, based on its interpretation of the record, the

prosecutor was not inviting the jury to consider non-statutory aggravation when she referred to

petitioner's "character;" rather, she "concentrated her remarks on the circumstances surrounding

the killing itself, namely, the kidnapping and alleged torture of Milano" and emphasized that the

jurors' "sentencing decision should not be based on their 'feelings,' but on 'objective standards

under the law' as applied to the underlying facts."  *Id.* (quoting N.T. Feb. 12, 2007, at 117, 126-

34). Finally, the Pennsylvania Supreme Court ruled that its confidence in the sentencing verdict was not undermined by the incorporation of this evidence because "through the verdict slip and accompanying instructions from the bench, the trial court channeled the jury's consideration of aggravating circumstances into the two discrete aggravators alleged by the Commonwealth. . . there is nothing in the record suggesting the jury was told it could consider aggravating evidence untethered to" the kidnapping and torture factors. *Id.*

Petitioner challenges the Pennsylvania Supreme Court's ruling on two grounds. First, petitioner contends that the court's conclusion "rested on a fundamental mischaracterization of the record that amounted to an unreasonable determination of the facts," thus entitling petitioner to relief under § 2254(d)(2). Second, petitioner argues that the court's ruling was contrary to federal law under § 2254(d)(1) on the ground that it departed from *Strickland*'s prejudice analysis, which requires a court to account for the fact that "'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support.'" Pet.'s br., at 84-87 (quoting *Strickland*, 466 U.S. 668, 696 (1984)).

The Pennsylvania Supreme Court addressed the prior bad acts claim on the merits, and thus § 2254(d) governs the Court's review of this claim.[17] The Court rejects both of petitioner's arguments and agrees with the Pennsylvania Supreme Court that petitioner did not show that he was prejudiced at sentencing by the introduction of this evidence during the guilt phase. First, the totality of the prior bad acts evidence consists of four small pieces of testimony during the guilt phase of the trial, which lasted five days. Second, there is no plausible likelihood that the

---

[17] Petitioner's brief argues that the Pennsylvania Supreme Court's alleged misapplication of *Strickland* means that that court's "prejudice analysis. . . deserves no deference." Pet.'s br., at 87. This argument is incorrect. The Pennsylvania Supreme Court clearly analyzed this as an ineffective assistance of counsel claim under *Strickland* and reached a decision on the merits. *See Laird*, 119 A.3d at 1005 (citing *Com. v. Hutchinson*, 811 A.2d 556, 562 (2002) (employing *Strickland* framework to ineffective assistance of counsel claim)). Thus, contrary to petitioner's argument, § 2254(d) precludes this Court from reviewing this claim *de novo*.

result of the penalty phase would have been different if this evidence, which was presented to the jury one week earlier during the guilt phase, had not been incorporated into the record in the penalty phase.

Petitioner attempts to argue that the jury's attention was drawn to the stale prior bad acts evidence when the prosecutor referred to that evidence in her closing argument at sentencing. According to petitioner, this comment caused the jury to improperly consider his character as a potential aggravating factor in violation of the Eighth Amendment.  Pet.'s br., at 62, 70.  As noted above, the prosecutor said: "And then the final, the catchall [mitigation factor], is any other evidence of mitigation concerning the character and the record of the defendant and the circumstances of his offense.  Well you already know a lot about Richard Laird's character, I submit to you."  N.T. Feb. 13, 2007, at 124.

When viewed in its entirety, the record demonstrates that petitioner's interpretation of the prosecutor's statement is incorrect: the prosecutor's comment did not constitute an argument that the jury should view petitioner's character—as evidenced by his prior bad acts—as a potential aggravating factor.  In general, during her closing argument to the jury at sentencing, the prosecutor identified specific evidence that she believed supported the aggravating factors presented by the Commonwealth or did not support the mitigating factors presented by the defense.  *See generally* N.T. Feb. 13, 2007, at 126-34 (prosecutor's closing argument on aggravating circumstances of kidnapping and torture and facts relevant to those two elements).[18] The excerpted statement relied on by petitioner comes from the prosecutor's discussion of the

---

[18] *See, e.g.*, N.T. Feb. 13, 2007, at 120 (arguing that the catchall mitigating factor was not substantiated by Mark Laird's testimony because "a lot of people in this world go through difficult things as young children. They go through difficult things and those people don't do the type of thing that Mr. Laird did to Anthony Milano"), at 122-23 (arguing that the mitigating factor that the defendant was unable to appreciate the criminality of his conduct was not warranted because of the evidence of how petitioner acted after the killing: "The cover up that started right away of getting rid of the shirt, getting rid of the murder weapon, running from the scene, the getting a ride home; washing blood off his hands").

catchall *mitigation* factor, during which she did not recall any evidence that she believed was particularly relevant to the mitigating factor of petitioner's character.  N.T. Feb. 13, 2007, at 124.  Therefore, petitioner's interpretation of what the prosecutor said on this issue is incorrect for two reasons: (1) the prosecutor did not refer to the prior bad acts evidence at all, and (2) the prosecutor only spoke of petitioner's character in the context of a *mitigation* factor, and did not argue that the jury could rely on his character as an aggravating circumstance.  Accordingly, the determination of the Pennsylvania Supreme Court that, in view of the totality of the evidence, the testimony of petitioner's prior bad acts or character was only "minor" and therefore unlikely to prejudice him at sentencing, was reasonable.  *See* 28 U.S.C. § 2254(d)(2).

The Court also rejects petitioner's argument that the Pennsylvania Supreme Court misapplied *Strickland* in evaluating prejudice.  *See* 28 U.S.C. § 2254(d)(1).  Petitioner is correct that *Strickland* requires the prejudice analysis to "consider the totality of the evidence before the judge or jury."  *Strickland*, 466 U.S. at 695.  *Strickland* also explained, in the context of potential prejudice at capital sentencing, that "the question is whether there is a reasonable probability that, absent the errors, the sentencer. . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id.*  The analysis of the Pennsylvania Supreme Court comports with these requirements.  That court examined the prior bad acts evidence in the context of all the other evidence heard by the jury during both the guilt and penalty phases, reviewed the prosecutor's closing argument, and determined that the jury would not have weighed the aggravating and mitigating factors any differently, primarily because the evidence challenged by petitioner was irrelevant to those factors.  *See Laird*, 119 A.3d at 987, 1005.  Therefore, the Pennsylvania Supreme Court did not misapply federal law under *Strickland*, and relief under § 2254(d)(1) is not warranted.

Petitioner relies on the general rule that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.  This aspect of *Strickland*, however, is inapposite under the circumstances presented in this case.  To demonstrate that he was prejudiced by his counsel's actions at sentencing, petitioner "must establish actual prejudice by showing that 'there is a reasonable probability that, absent the errors, the sentencer… would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"  *Richmond v. Polk*, 375 F.3d 309, 327 (4th Cir. 2004) (quoting *Strickland*, 466 U.S. at 695).  There was no mention of the prior bad acts during the attorneys' arguments or the trial court's instructions at sentencing, and therefore there is no link between the minor evidence of prior bad acts admitted during the guilt phase and petitioner's sentence.  Thus, the Pennsylvania Supreme Court reasonably concluded that petitioner suffered no prejudice.

Because the Pennsylvania Supreme Court reasonably rejected petitioner's *Strickland* claim based on the admission of prior bad acts evidence, this Court denies Laird's Petition under § 2254 on this ground.

### 4.   Trial Court's Instructions and Prosecutor's Argument Regarding Mitigation (Claim II)

Petitioner's final sentencing phase argument is that the trial court's instruction on the definition of mitigating evidence, and the prosecutor's closing argument to the jury which repeated language from the trial court's instruction, violated his Eighth Amendment right to a fair sentencing.  Petitioner contends that his trial counsel was ineffective under *Strickland* for failing to object to the trial court's instruction and the prosecutor's argument.  For the following reasons, the Court rejects petitioner's claim.

At the end of the penalty phase, the trial court instructed the jury, in part, as follows:

> Members of the jury, you must now decide whether to sentence the
> defendant to death or life imprisonment.  Your sentence will depend upon
> what you find about aggravating and mitigating circumstances.  *The
> sentencing code defines aggravating and mitigating circumstances. They're
> things that make a first degree murder case either more terrible or else less
> terrible.*

N.T. Feb. 13, 2007, at 164 (emphasis added).  After instructing the jury that aggravating factors

must be found unanimously and beyond a reasonable doubt, but that mitigating factors could be

found by individual jurors based on only a preponderance of evidence, the trial court explained

that "[t]his different treatment of aggravating and mitigating circumstances is one of the law[']s

safeguards against unjust death sentences.  It gives the defendant a full benefit of any mitigating

circumstances."  N.T. Feb. 13, 2007, at 167-68.  The trial court also told the jury that three

mitigating factors presented by the defense—extreme mental or emotional disturbance, capacity

of the defendant to appreciate the criminality of his conduct, and defendant's age at the time of

the offense—as well as the catchall factor—the character of the defendant and circumstances of

the offense—were "identified by the legislature for your consideration" and that the law

"provides that you are to consider" these factors.  N.T. Feb. 13, 2007, at 172-73.  The trial court

finally instructed the jury that "you should, when you go back to deliberate, consider all of the

factors on the verdict slip if you reach the issue of mitigating factors." N.T. Feb. 13, 2007 at 175.

During her closing argument to the jury, the prosecutor anticipated the trial court's

definition of mitigating circumstances as things that make the case "less terrible."  At various

points in her summation, the prosecutor made the following statements:

- "So let's talk a little bit about the first, if you you've heard any evidence that
makes this case less terrible over the past day or so. . . . Did the testimony from the
deacon and the two prison guards that you heard, does that qualify as a mitigating
circumstance? In other words, did it make this case, this killing, less terrible? I submit to
you that it doesn't."  N.T. Feb. 13, 2007, at 117-19;

- In reference to the testimony from Mark Laird, Dr. Dee, and Dr. Fox about
petitioner's mental health and history of abuse: "You have to decide, number 1, whether

it's believable and, number 2, does it really make this case, this killing, less terrible? Because that's what you're ultimately going to have to decide."  N.T. Feb. 13, 2007, at 121;

- In reference to the catchall mitigation factor concerning defendant's character and the circumstances of the offense: "Now, under this they have physical abuse, sexual abuse, emotional abuse, witnessed the abuse of others, the psychological consequences of this abuse.  Well, the first thing that has to happen is, you have to believe that, number 1, that the abuse occurred.  And the second question is, does it rise to the level of what they're talking about that makes this case, this killing, any less terrible?  They're talking about, again, the alcohol abuse, the substance abuse and the conduct in the prison.  Again, ladies and gentlemen, I submit to you that all of those things don't have an impact and don't make this case any less terrible."  N.T. Feb. 13, 2007, at 124-25;

- "So those are the things that the defense argues to you that they've proven. . . They established that those mitigating circumstances somehow make this crime less terrible."  N.T. Feb. 13, 2007, at 126.

Petitioner claims that the trial court's instruction and prosecutor's statements that "mitigating circumstances. . . [are] things that make a first degree murder case. . . less terrible" conflicts with the Eighth Amendment's requirements that capital sentencing be "based on a 'reasoned moral response' to the background and character of the defendant as a 'uniquely individual human being,' and. . . that the jury give full consideration and full effect to any mitigating evidence the defendant presents."  Pet.'s br., at 53-54 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)) (internal citations omitted).  According to petitioner, "the Eighth Amendment does not focus on '*the case*' or '*the killing*,' but on *the individual defendant*."  Pet.'s br., at 54.  Petitioner claims that his counsel was ineffective for failing to object to the trial court's instruction and prosecutor's argument on the ground that they "diverted the focus of the jury's life or death deliberation from a reasoned determination as to Petitioner's personal culpability to an amorphous and unguided consideration of how 'terrible' 'the case' was."  Pet.'s br., at 54, 56-58.

Petitioner raised this *Strickland* claim in the Pennsylvania Supreme Court on post-conviction review.  That court relied on its own precedent interpreting similar instructions in

rejecting petitioner's claim on the ground that the challenged instructions did not, "'as a whole, interfere[ ] with the jury's evaluation of the specific mitigation evidence presented by Appellant or their assessment of his personal moral culpability.  These instructions merely expressed to the jury, in laymen's terms, the purpose for the distinction between aggravating and mitigating circumstances in a capital penalty phase.'"  *Com. v. Laird*, 119 A.3d 972, 1006 (Pa. 2015) (quoting *Com. v. Washington*, 927 A.2d 586, 613-614 (Pa. 2007)).  That court then ruled that petitioner's related argument concerning the prosecutor's argument was meritless.  Specifically, the Pennsylvania Supreme Court stated that, "[i]nasmuch as these repeated instructions were proper, . . . it is speculative to argue that the prosecutor's earlier description of mitigation, couched in terms of whether a 'case' or a 'killing' was rendered less terrible, interfered with the jury's ability to carry out its Eighth Amendment duties, notwithstanding that the prosecutor may have reiterated this description several times."  *Id.* at 1007.

    The Pennsylvania Supreme Court adjudicated this claim on the merits, and thus § 2254(d) governs the Court's review of this claim.  Petitioner contends that the decision of the Pennsylvania Supreme Court was contrary to federal law and unreasonable in light of the record, and thus argues that relief is warranted under §§ 2254(d)(1) and (d)(2).  Pet.'s br., at 60.  This Court rejects both of petitioner's challenges.

    In evaluating a jury instruction, the Court's "analysis must focus initially on the specific language challenged, but must consider that language as part of a whole."  *United States v. Gordon*, 290 F.3d 539, 544 (3d Cir. 2002) (citing *Francis v. Franklin,* 471 U.S. 307, 315 (1985)).  The central inquiry is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (quoting *Boyde v. California,* 494 U.S. 370, 380 (1990)).

The Court first notes that petitioner raised a nearly identical claim in his petition for habeas relief from his first conviction.  Previously, petitioner claimed that he was prejudiced at his first sentencing hearing in 1988 when his counsel failed to object to the trial judge's comments at the beginning of the penalty phase that, "[i]n general terms, aggravating and mitigating circumstances are circumstances concerning the killing and the killer which *make a first degree murder case either more serious or less serious*."  *Laird v. Horn*, 159 F. Supp. 2d 58, 108 (E.D. Pa. 2001) (emphasis added).  Specifically, petitioner argued "that by using the words 'in this case,' the trial court improperly focused the jury's attention on the murder, and away from petitioner's background. . . thus failing to convey to the jury that it could take petitioner's background and character into account in its analysis of mitigating circumstances."  *Id.*  This Court rejected that claim on the ground that these introductory comments were not reasonably likely to have diverted the jury from considering constitutionally relevant evidence because the trial court's charge "accurately informed the jury that it could take petitioner's background and character into account."  *Id.* at 109 (citing *Boyde*, 494 U.S. at 380).

In the habeas Petition presently before the Court, petitioner claims that similar language used in the trial court's instructions at his 2007 trial caused him to suffer prejudice for the same reasons.  This Court concludes that the Pennsylvania Supreme Court's rejection of this claim was not unreasonable.  The specific language to which petitioner objects is nearly identical to Pennsylvania Standard Criminal Jury Instruction 15.2502E(1), which both state and federal courts have upheld in the face of identical Eighth Amendment challenges.[19]  *See, e.g.*, *Lesko v. Wetzel*, No. 11 Civ. 1049, 2015 WL 249502, at *46-47 (W.D. Pa., Jan 20, 2015) (concluding that

---

[19] The Court notes that the current version of this instruction no longer contains the "less terrible" language and contains no definition of aggravating or mitigating circumstances in general.  15.2502E (Crim) Death Penalty, Instruction Before Hearing, Pa. SSJI (Crim) (2016), note.

"more terrible/less terrible instructions" are not erroneous); *Marinelli v. Beard*, No. 07 Civ. 173, 2012 WL 5928367, at *96-97 (M.D. Pa., Nov. 26, 2012) (same); *Stevens v. Beard*, 701 F. Supp. 2d 671, 735 (W.D. Pa. 2010) (same); *Laird*, 119 A.3d at 1006-07 (collecting Pennsylvania cases).  In particular, every federal court to have considered this instruction has found "no error in the language" challenged by petitioner and characterized it as a permissible way for the trial court to "explain[ ] generally the role of mitigating and aggravating factors in a capital case as it introduced those concepts to the jury." *Lesko*, 2015 WL 249502, at *47; *accord Stevens*, 701 F. Supp. 2d at 735.  This Court agrees with those decisions, and concludes that the specific language challenged by petitioner was not reasonably likely to have diverted the jury from its duty under the Eighth Amendment to consider all mitigation evidence presented by the defense.

Moreover, in the context of the charge as a whole, this single sentence in the trial court's instructions was unlikely to have caused the jury to disregard the mitigating evidence related to petitioner's character and background in violation of the Eighth Amendment.  After the trial court generally defined mitigating circumstances as things that make the "case. . . less terrible," the court continued to explain to the jury that state law requires them to consider all mitigating factors presented by the defense and to "give[ ] the defendant a full benefit of any mitigating circumstances."  N.T. Feb. 13, 2007, at 164, 167-68.  The trial court ended its instruction on that issue by telling the jurors that "you should. . . consider all of the [mitigating] factors on the verdict slip."  N.T. Feb. 13, 2007, at 175.  Based on this record, petitioner has failed to show that it was reasonably likely that the jury applied these instructions in an unconstitutional manner.  Therefore, the conclusion of the Pennsylvania Supreme Court that petitioner failed to demonstrate that the charge "as a whole" was unconstitutional was reasonable.  *Estelle*, 502 U.S. at 72.

Finally, petitioner's focus on the prosecutor's emphasis of the "less terrible" language in an attempt to demonstrate increased prejudice from the challenged instruction is misplaced.  If the trial court's definition of mitigating circumstances as "less terrible" was proper, the prosecutor cannot be faulted for quoting the same definition in her closing argument.  Initially, the Court notes that "arguments of counsel generally carry less weight with a jury than do instructions from the court" and, "like the instructions of the court, must be judged in the context in which they [we]re made."  *Boyde*, 494 U.S. at 384-85.

Moreover, the prosecutor's comments in this case did not increase the likelihood that the jury misapplied the trial court's instructions for two reasons.  First, as explained above, the trial court told the jury that they must consider the mitigating evidence submitted by the defense.  Second, defense counsel's closing argument noted the potentially misleading nature of the prosecutor's comments and explained what was missing.  Specifically, defense counsel argued to the jury:

> Now, we presented numerous mitigating factors, and pretty much the Commonwealth dismisses them out of hand. They're all useless, they don't make it less terrible. Well, that's not the complete definition of what mitigating factors are. Mitigating factors, and the Court will tell you, are things you're supposed to consider.  Again, I didn't make these mitigators up. They come from our statutes and our Courts. You will see the wording of them as they are read off to you. I didn't make these up. This physical abuse is not something I made up. It exists. It's in our statutes and our Courts. Sexual abuse, I didn't make it up. It's in our statutes and it's in our Courts' decisions. These are things that they've laid out that must be presented on someone's behalf if they're facing the death penalty ... must be. So don't think that we're trying to make excuses. . .  These are Court designated mitigating factors, and they aren't just to the crime itself. . . You try the crime, you sentence the person. These factors are about the person.

N.T. Feb. 13, 2007, at 145-46.  For these reasons, the conclusion of the Pennsylvania Supreme Court that the prosecutor's argument did not "interfere[ ] with the jury's ability to carry out its Eighth Amendment duties" was not unreasonable in light of the record.  *Laird*, 119 A.3d at 1007.

103

The Court concludes that the Pennsylvania Supreme Court's rejection of petitioner's claim regarding the trial court's instruction on mitigating circumstances and the prosecutor's argument on the definition of mitigating circumstances were not contrary to federal law or an unreasonable interpretation of the record. This Court thus rejects Laird's Petition under § 2254 for habeas relief on this ground.

### C. Cumulative Prejudice Claim (Claim X)

Petitioner finally claims that the cumulative prejudice resulting from all of the constitutional errors at his trial warrants habeas relief. Pet.'s br., at 155. Petitioner relies on the cumulative error standard articulated by the Supreme Court of the United States in *Kyles v. Whitley*, 514 U.S. 419, 435 (1995), which requires the court to consider "all errors, whether [based on] constitutional or state law, and ask whether the cumulative effect of these errors, in light of the evidence offered at trial as a whole, created a 'reasonable probability' that 'the result of the proceeding would have been different'" under *Strickland*, and "require[s] the petitioner to show that the cumulative effect of trial errors 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Collins v. Beard*, 2012 WL 3135625, at *20 (E.D. Pa. Feb. 29, 2012) (quoting *Kyles*, 514 U.S. at 435, *Strickland*, 466 U.S. at 694), *report and recommendation adopted by Collins v. Beard*, 2012 WL 3136768.[20]

As explained above, petitioner has failed to demonstrate that his retrial and resentencing were infected by any errors. *See id.* (rejecting cumulative prejudice claim and noting that "[t]rial *errors* are different from *imperfections* in the trial." (emphasis in original)). Consequently, there are no errors to aggregate and petitioner cannot prove cumulative prejudice.

---

[20] The Court of Appeals for the Third Circuit requires "a claim of cumulative error [to] be presented to the state courts before it may provide a basis for habeas relief." *Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 543 (3d Cir.), *cert. denied sub nom. Collins v. Wetzel*, 135 S. Ct. 454 (2014). Petitioner exhausted his cumulative prejudice claim before the Pennsylvania Supreme Court, and that court rejected that claim on the merits. *Laird*, 119 A.3d at 1012.

*See, e.g.*, *Robinson v. Sup't, SCI Somerset*, No. 13 Civ. 6918, 2014 WL 7232239, at *15 (E.D. Pa. Dec. 17, 2014) ("The cumulative error doctrine requires the existence of 'errors' to aggregate. Absent such errors by counsel, the cumulative error doctrine does not apply.").  Thus, Laird's Petition under § 2254 on this ground is denied.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, petitioner's Consolidated Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 is denied and dismissed.  A certificate of appealability will not issue because reasonable jurists would not debate whether the petition states a valid claim of the denial of a constitutional right or this Court's procedural rulings with respect to petitioner's claims. *See* 28 U.S.C. § 2253(c)(2) (providing that a certificate of appealability in a § 2254 case "only if the applicant has made a substantial showing of the denial of a constitutional right"); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  An appropriate order follows.